**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANATOL ZUKERMAN** | |
| and | |
| **CHARLES KRAUSE REPORTING, LLC,** | |
| Plaintiffs, | Case No. 1:15-cv-2131-CRC |
| v. | |
| **UNITED STATES POSTAL SERVICE,** | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO DISMISS PLAINTIFFS' SUPPLEMENTAL COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 4

    I.    The Customized Postage Program ...................................................... 4

    II.   Procedural History ............................................................................. 8

STANDARD OF REVIEW ................................................................................... 11

ARGUMENT ........................................................................................................ 12

    I.    Plaintiffs' Original Claims Should Be Dismissed For Lack of Jurisdiction ...... 12

        A.    Plaintiffs' Original Claims Challenge an Enforcement Regime that
               No Longer Exists ...................................................................... 13

        B.    Plaintiffs Are Not Entitled to Injunctive Relief or Declaratory Relief
               on Their Original Claims .......................................................... 21

    II.   The Regulations Governing the Customized Postage Program Establish a
         Nonpublic Forum Within Which USPS Is Permitted to Exclude Categories
         of Speech, Including Political Speech ............................................... 23

        A.    USPS Expressed Its Clear Intent to Create a Nonpublic Forum............... 24

        B.    Other Objective Indicia of USPS's Intent Confirm that USPS Intended
               to Create a Nonpublic Forum................................................... 28

        C.    The Exclusion of Political Content in USPS's Regulations Is
               Reasonable and Viewpoint Neutral ......................................... 33

            i.    The Restriction on Political Content Reasonably Serves
                  USPS's Interests.......................................................... 33

            ii.  The Restriction on Political Content Is Viewpoint Neutral .......... 36

CONCLUSION..................................................................................................... 41

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Adams v. U.S. Capitol Police Bd.*,
  564 F. Supp. 2d 37 (D.D.C. 2008) .............................................................................. 11

*Adderley v. Florida*,
  385 U. S. 39 (1966) ....................................................................................................... 25

*Akiachak Native Cmty. v. U.S. Dep't of Interior*,
  827 F.3d 100 (D.C. Cir. 2016) ..................................................................................... 19

*Am. Bar Ass'n v. FTC*,
  636 F.3d 641 (D.C. Cir. 2011) ..................................................................................... 16

*Am. Civil Liberties Union Found. v. Wash. Metro. Area Transit Auth.*,
  303 F. Supp. 3d 11 (D.D.C. 2018) ............................................................................... 13

*Am. Civil Liberties Union v. Mineta*,
  319 F. Supp. 2d 69 (D.D.C. 2004) ............................................................................... 21

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
  815 F.3d 105 (2d Cir. 2016) ......................................................................................... 20

*American Freedom Defense Initiative v. WMATA*,
  245 F. Supp. 3d 205 (D.D.C. 2017) ....................................................................... 19, 32

*Archdiocese of Washington v. Wash. Metro. Area Transit Auth.*,
  2018 WL 3625417 (D.C. Cir. July 31, 2018) ....................................................... *passim*

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) ..................................................................................... 21, 25, 26, 27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................... 11

*Bannon v. Sch. Dist. of Palm Beach Cty.*,
  387 F.3d 1208 (11th Cir. 2004) .............................................................................. 38, 39

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 11, 12

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ..................................................................................................... 24

*Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*,
  127 F.3d 207 (2d Cir. 1997) ........................................................................... 39

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008) ............................................. 27, 28, 32, 36

*Campbell v. St. Tammany Par. Sch. Bd.*,
  300 F.3d 526 (5th Cir. 2002) (Gibson, J., concurring) ................................. 39

*Chapel v. Center Moriches Union Free School District*,
  508 U.S. 384 (1993) ....................................................................................... 37

*Cierco v. Lew*,
  190 F. Supp. 3d 16 (D.D.C. 2016*), aff'd on other grounds sub nom.*
  *Cierco v. Mnuchin*, 857 F.3d 407 (D.C. Cir. 2017) ...................................... 11

*Citizens United v. Federal Election Commission*,
  558 U.S. 310 (2010) ......................................................................................... 8

*Cogswell v. City of Seattle*,
  347 F.3d 809 (9th Cir. 2003) .......................................................................... 38

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) .............................................................................. *passim*

*Currier v. Potter*,
  379 F.3d 716 (9th Cir. 2004) .......................................................................... 23

*Del Gallo v. Parent*,
  557 F.3d 58 (1st Cir. 2009) ....................................................................... 34, 35

*Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.*,
  404 U.S. 412 (1972) ........................................................................................ 18

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*,
  196 F.3d 958 (9th Cir. 1999) .......................................................................... 29

*Good News Club v. Milford Central School*,
  533 U.S. 98 (2001) .................................................................................... 37, 40

*Gordon v. Office of the Architect of the Capitol*,
  750 F. Supp. 2d 82 (D.D.C. 2010) .................................................................. 11

*Haase v. Sessions*,
  835 F.2d 902 (D.C. Cir. 1987) ........................................................................ 11

*Hodge v. Talkin,*
   799 F.3d 1145 (D.C. Cir. 2015) ............................................................. 33, 36

*Honeywell Int'l, Inc. v. NRC,*
   628 F.3d 568 (D.C. Cir. 2010) ................................................................... 11

*Hopper v. City of Pasco,*
   241 F.3d 1067 (9th Cir. 2001) ............................................................... 28, 32

*Initiative & Referendum Inst. v. U.S. Postal Serv.,*
   116 F. Supp. 2d 65 (D.D.C. 2000) ............................................................. 36

*Initiative & Referendum Inst. v. U.S. Postal Serv.,*
   685 F.3d 1066 (D.C. Cir. 2012) .................................................... 18, 28, 29

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,*
   505 U.S. 672 (1992) .................................................................................. 13

*Iron Arrow Honor Soc'y v. Heckler,*
   464 U.S. 67 (1983) .................................................................................... 16

*Lehman v. City of Shaker Heights,*
   418 U.S. 298 (1974) ....................................................................... 28, 29, 37

*Longo v. U.S. Postal Serv.,*
   953 F.2d 790 (2d Cir. 1992), *vacated on other grounds,* 506 U.S. 802 (1992) ........... 35

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) .............................................................................. 27

*Minn. Voters All. v. Mansky,*
   138 S. Ct. 1876 (2018) ...................................................................... *passim*

*Monterey Cnty. Democratic Cent. Comm. v. U.S. Postal Serv.,*
   812 F.2d 1194 (9th Cir. 1987) ................................................................... 36

*Morrow v. United States,*
   723 F. Supp. 2d 71 (D.D.C. 2010) ............................................................. 11

*Nat'l Black Police Ass'n v. District of Columbia,*
   108 F.3d 346 (D.C. Cir. 1997) ............................................................. 16, 18

*Nat'l Endowment for the Arts v. Finley,*
   524 U.S. 569 (1998) ............................................................................. 24, 37

*New England Reg'l Council of Carpenters v. Kinton,*
   284 F.3d 9 (1st Cir. 2002) ................................................................................ 19, 23

*Oberwetter v. Hilliard,*
   639 F.3d 545 (D.C. Cir. 2011) ...................................................... 13, 29, 36

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
   460 U.S. 37 (1983) ............................................................................ *passim*

*Perry v. McDonald,*
   280 F.3d 159 (2d Cir. 2001) ...................................................................... 29

*Pleasant Grove City v. Summum,*
   555 U.S. 460 (2009) ...................................................................................... 13

*Ridley v. Mass. Bay Transp. Auth.,*
   390 F.3d 65 (1st Cir. 2004) ................................................................ *passim*

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) .......................................................................... *passim*

*Rust v. Sullivan,*
   500 U.S. 173 (1991) ...................................................................................... 24

*Seattle Mideast Awareness Campaign v. King Cnty.,*
   781 F.3d 489 (9th Cir. 2015) ................................................................ 29, 32

*Sons of Confederate Veterans, Va. Div. v. City of Lexington,*
   722 F.3d 224 (4th Cir. 2013) ...................................................................... 23

*Stewart v. D.C. Armory Bd.,*
   863 F.2d 1013 (D.C. Cir. 1988) .................................................... 25, 28, 32

*United States v. Bjerke,*
   796 F.2d 643 (3d Cir. 1986) ...................................................................... 21

*United States v. Kokinda,*
   497 U.S. 720 (1990) .............................................................................. 32, 36

*Uptown Pawn & Jewelry, Inc. v. City of Hollywood,*
   337 F.3d 1275 (11th Cir. 2003) ................................................................ 32

**STATUTES**

18 U.S.C. § 8 ............................................................................................................ 4

39 U.S.C. § 403(c) ............................................................................................ 8, 9

39 U.S.C. § 3622(b)(5) .................................................................................... 5, 29

Fed. R. Civ. P. 12(b) ..................................................................................... *passim*

Fed. R. Civ. P. 15(d) ............................................................................................ 2

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

39 C.F.R. § 501.1(a) ............................................................................................ 4

39 C.F.R. § 501.21 .................................................................................... 17, 29, 36

## OTHER AUTHORITIES

Customized Postage,
    70 Fed. Reg. 21,821-01 (Apr. 27, 2005) .......................................... 4, 5, 6, 30

Customized Postage,
    71 Fed. Reg. 12,718-01, 12,719 (Mar. 13, 2006) ................................. 5, 6, 27

Revisions to the Requirements for Authority To Manufacture and Distribute Postage
    Evidencing Systems; Customized Postage Products,
    82 Fed. Reg. 1,294-01, 1,294 (Jan. 5, 2017) .................................................. 6

Revisions to the Requirements for Authority To Manufacture and Distribute Postage
    Evidencing Systems; Customized Postage Products,
    82 Fed. Reg. 60,117 (Dec. 19, 2017) ...................................................... *passim*

USPS, Domestic Mail Manual,
    § 604.4.3(b) (Mar. 3, 2018), https://pe.usps.com/text/dmm300/
    604.htm#ep1080496 (last visited August 16, 2018) ................................. 5, 31

## INTRODUCTION

This case concerns the United States Postal Service's ("USPS") Customized Postage program and USPS's reservation of that program for only certain types of content. Customized Postage is a specialized form of PC Postage, in which consumers and businesses can print out valid U.S. postage labels (indicating prepayment of postage) using an Internet-connected personal computer. Customized Postage can be used by anyone to send First-Class Mail, just as they would use U.S. postal stamps. Through the Customized Postage program, which launched in 2004, USPS for the first time allowed individuals to personalize PC Postage by printing a customer-supplied image next to the secure indicia of prepayment. Sale and fulfillment of orders of Customized Postage is handled by third-party vendors in the Customized Postage program. Until May 15, 2018, Zazzle, Inc., an online company that sells a variety of personalized products, was one such vendor in the program.

In April 2015, Plaintiff Anatol Zukerman placed an order for Customized Postage with Zazzle featuring a design that depicted Uncle Sam being strangled by a snake labeled *Citizens United*, next to the caption "Democracy Is Not for Sale." In accordance with Zazzle's authorization agreement with USPS, which required Zazzle to comply with USPS's Standardized Image Guidelines and exclude designs containing *inter alia* partisan and political content, Zazzle rejected Plaintiff Zukerman's order. Plaintiffs brought suit on December 9, 2015, proffering constitutional challenges based on USPS's Standardized Image Guidelines and Zazzle's application of those Guidelines while it had been a vendor in the program. Plaintiffs contended that Zazzle's rejection of Plaintiff Zukerman's order violated the First and Fifth Amendments because Zazzle had allegedly

fulfilled other orders for Customized Postage where the designs contained political content, in violation of USPS's Guidelines.

On December 19, 2017, USPS issued through notice-and-comment rulemaking new regulations governing the Customized Postage program.  The regulations narrow the types of content permissible on Customized Postage in order to protect USPS's brand and business interests.  Designed to replace and supersede USPS's old Standardized Image Guidelines, USPS explained that the regulations "give regulatory form to the existing requirements for authorization to produce Customized Postage products" and seek to remedy any "inconsistency of publicly available provider content guidelines" that might have "caused confusion over Customized Postage products."  Revisions to the Requirements for Authority To Manufacture and Distribute Postage Evidencing Systems; Customized Postage Products, 82 Fed. Reg. 60,117-01, 60,117-18 (Dec. 19, 2017).

Seven months after USPS announced its new regulations, Plaintiffs filed a Supplemental Complaint to proffer a facial First Amendment challenge to the restriction on political speech contained in the new regulations.  Plaintiffs' facial challenge arises not from Zazzle's rejection of Plaintiff Zukerman's original order for Customized Postage, but rather, from wholly separate conduct.  As Zazzle's authorization to participate in the program expired on May 15, 2018, Plaintiffs placed new orders for Customized Postage with a different vendor, Stamps.com, using designs that were "substantively identical" to Plaintiff Zukerman's original order.  Pls.' Suppl. Pleading Pursuant to Fed. R. Civ. P. 15(d) ("Suppl. Compl.") ¶¶ 4, 6, 8, ECF No. 52.  Stamps.com rejected those orders based on the content restrictions set forth in USPS's regulations, and not based on USPS's prior Standardized Image Guidelines.  Plaintiffs recognize as much

in their Supplemental Complaint, admitting that as of May 15, 2018, USPS's new

regulations "are the exclusive content guidelines for the customized postage program."

*Id*. ¶ 3 (emphasis omitted).

Despite such concessions, Plaintiffs have not abandoned their original claims.

They challenge both USPS's new regulations, which currently constitute the only

operative content guidelines for the program, as well as USPS's prior Standardized Image

Guidelines, which were applicable at the time Plaintiffs filed suit.  Plaintiffs' claims

relating to USPS's Standardized Image Guidelines and Zazzle's actions operating under

those Guidelines, however, are moot.  A judicial ruling on the validity of those

Guidelines, which have been superseded by regulation, would be a purely advisory

exercise.  The same is true of any judgment by the Court regarding the past conduct of

Zazzle, which currently lacks any authority to participate in the program.  Simply put,

Plaintiffs are not entitled to the declaratory or injunctive relief they seek based on an

enforcement regime that no longer exists and a third-party vendor that is no longer

authorized to participate in the program.

The only claim in this case that presents a live case or controversy is Plaintiffs'

facial First Amendment challenge to USPS's new regulations for the Customized Postage

program.  That claim, however, fails as a matter of law, as the regulations and USPS's

final rule make clear that USPS intends for the program to operate as a nonpublic forum.

In such a nonpublic forum, the Government may, as USPS has done here, reserve the

forum for only certain types of speech to the exclusion of others, including political

speech.  Thus, because USPS's exclusion of political speech from the program is

reasonable and viewpoint neutral, USPS's regulations do not facially violate the First

Amendment, as Plaintiffs contend.

Accordingly, the Court should dismiss under Federal Rule of Civil Procedure 12(b)(1) Plaintiffs' original claims as moot, and it should dismiss under Federal Rule of Civil Procedure 12(b)(6) Plaintiffs' facial challenge to the restrictions on political speech contained in USPS's current regulations.[1]

## BACKGROUND

### I.      The Customized Postage Program

The Customized Postage program launched in 2004 as a new offering in USPS's PC Postage program.  Customized Postage, 70 Fed. Reg. 21,821-01 (Apr. 27, 2005).  PC Postage products allow customers to produce via their home computer and printer "evidence of prepayment of postage," 39 C.F.R. § 501.1(a), also known as "postage indicia."  PC Postage products are distinct from U.S. postal stamps, which are produced by USPS and constitute obligations or securities of the United States like U.S. currency, *see* 18 U.S.C. § 8.

Postage indicia produced by PC Postage is typically comprised of two elements. First, it contains a bar code or other secure indicia of prepayment of postage.  70 Fed. Reg. at 21,821.  Second, there is an area adjacent to the payment indicia, historically referred to as an "ad plate," where customers can print advertising messages authorized, enabled, and controlled by the postage provider (such as the owner or operator of a

---

[1] In their Supplemental Complaint, Plaintiffs "incorporate by reference every allegation in [their] First Amended Complaint."  Suppl. Compl. ¶ 1.  In their Amended Complaint, Plaintiffs did not set forth their claims and causes of action in a separate section of the pleading, but rather, stated their claims within the numbered paragraphs in which they stated their allegations.  *See* Am. Compl. ¶¶ 44, 45.  The Supplemental Complaint thus incorporates Plaintiffs' original constitutional claims, in addition to their new facial claim.  In this motion, USPS seeks the dismissal of all of Plaintiffs' claims.

postage meter). *Id*. The ad plate area has always been offset by a "1/2-inch clear zone to the left of and below" the payment indicia. USPS, Domestic Mail Manual, § 604.4.3(b) (Mar. 3, 2018), https://pe.usps.com/text/dmm300/604.htm#ep1080496 (last visited August 16, 2018). Customized Postage products are the only exception to the "clear zone"-rule. They permit the placement of graphic content within that half-inch space to the left of payment indicia produced by PC Postage. *See id*. (nothing may be "printed or placed" in the clear zone "except for images obtained from a USPS-approved licensed vendor of customized PC postage"). The Customized Postage program offers customers the unique opportunity to personalize their postage by printing a customer-supplied image in the clear zone normally reserved by postal regulation. *Id*. The goal of offering such an opportunity via the Customized Postage program was to help USPS "assure adequate revenues, including retained earnings, [and] to maintain financial stability." 39 U.S.C. § 3622(b)(5); *see also* Request of the United States Postal Service to Add Postal Products to the Mail Classification Schedule in Response to Order No. 154, Ex. D at 1, *Modification of Mail Classification Schedule Product Lists in Response to Order No. 154*, No. MC2009-19 (Postal Regulatory Comm'n Mar. 10, 2009) (citing 39 U.S.C. § 3622(b)(5) as the objective of the Customized Postage program).

From the outset, it was "the Postal Service's declared intent not to allow its Customized Postage program to become a public forum for dissemination, debate, or discussion of public issues." Customized Postage, 71 Fed. Reg. 12,718-01, 12,719 (Mar. 13, 2006). USPS also expressed concerns early on about "the likelihood that the public [would] be misled into believing that the product image [in Customized Postage] originated with the Postal Service." 70 Fed. Reg. at 21,822. Given this risk of

misattribution, USPS restricted vendors in the program from allowing certain types of

content to be used in Customized Postage, including obscene content, defamatory

content, content advocating unlawful action, and content that could "harm the public

image, reputation, or good will of the Postal Service." 71 Fed. Reg. at 12,719. USPS

also reserved the right to cancel the authorization of any vendor in the Customized

Postage program if USPS concluded that the vendor's participation "present[ed]

unacceptable risk to Postal Service revenues" or would "cause public or political

embarrassment or harm to the Postal Service in any way." 70 Fed. Reg. at 21,822.

For most of the program's history, USPS restricted the types of content

permissible for use on Customized Postage by requiring vendors in the program to abide

by its Standardized Image Guidelines, which were attached to the authorization

agreements that vendors signed when joining the program. *See* Revisions to the

Requirements for Authority To Manufacture and Distribute Postage Evidencing Systems;

Customized Postage Products, 82 Fed. Reg. 1,294-01, 1,294 (Jan. 5, 2017) (referring to

content restrictions set forth in "individual approval letters issued to providers"). On

January 5, 2017, USPS issued a proposed rule that would give "regulatory form" to the

content restrictions applicable to Customized Postage. *Id*. Specifically, the rule would

"create standardized definitions, requirements, and procedures applicable to the

authorization to provide Customized Postage products, and incorporate protections for

the Postal Service's legal, financial, or brand interests." *Id*.

USPS finalized the rule on December 19, 2017, which reflected changes made

based on industry comments on the proposed rule. 82 Fed. Reg. at 60,117-18. In the

rule, USPS reiterated that "Customized Postage products are not U.S. stamps," but rather,

"are a specialized form of evidence of prepayment of postage." *Id*. at 60,117.  However,

because Customized Postage "share[s] the function and appearance of U.S. stamps,"

USPS emphasized that it "must limit eligible private content [used on Customized

Postage] to protect its own business and brand interests against dilution, false attribution,

appearances of endorsement, and other potential impacts." *Id*.

Accordingly, the final rule and the regulations it adopts limit the types of content

permissible on Customized Postage to only two categories: (1) commercial content,

defined as images or text "intended for no purpose other than the sale of goods or

services in commerce," and (2) social content, defined as images or text "promoting or

depicting people, animals, items, or events commonly associated with community

relations or companionship and likely to generate invitations, announcements, notices,

thank-you notes, RSVPs, or similar correspondence." *Id*. at 60,118.  In addition, the

regulations require that permissible content be "suitable for all-ages audiences"—a

prerequisite intended, consistent with USPS's "original program purposes," to "limit

content to family-friendly images or text that would not cause concern among

mainstream, multi-generational users of the mail." *Id*.  To this end, the rule "[e]xclud[es]

entire categories of content altogether to help avoid unlawful viewpoint discrimination,"

including political, religious, violent, and sexual content. *Id*. at 60,117.  These

enumerated categories, USPS instructed, were to "be read as illustrative and not

exhaustive." *Id*. at 60,118.

USPS emphasized that, in total, "ineligibility [is] the default presumption for all

content considered under the" new regulations. *Id*.  The only content permissible for use

on Customized Postage is "a commercial or social image that is suitable for all-ages

audiences." *Id*.  Any other type of content "is presumed to be prohibited," "even if [it is] not explicitly included in the [regulations'] list of prohibitions."  *Id*.  Vendors "may not use any other eligibility criteria, represent the use of any other eligibility criteria to customers, or otherwise give the appearance that any eligibility criteria other than the Eligibility Criteria [identified in the regulations] is used in providing or accepting images and/or text for Customized Postage products."  *Id*. at 61,119.  As it had done previously, USPS reserved the right to suspend or revoke a vendor's authorization to participate in the program "if Customized Postage products or infrastructure of the provider is determined to constitute an unacceptable risk to Postal Service business interests, including legal, financial, or brand interests."  *Id.*

## II.    Procedural History

On April 27, 2015, Plaintiff Anatol Zukerman submitted an order for Customized Postage to Zazzle, a previously authorized vendor in the program.  Am. Compl. Ex. M at 4, ECF No. 51-16.  The design depicts "Uncle Sam being strangled by a snake labeled *Citizens United* and configured as a dollar sign,"[2] with the text "Democracy is Not for Sale" printed vertically along the left edge.  Am. Compl. ¶¶ 17, 20.  After initially accepting the order, Zazzle sent Plaintiff Zukerman an order cancellation notice later that day stating that Zazzle was "unable to process [his] order" because the "[d]esign incorporates material that is primarily partisan or political in nature."  Am. Compl. Ex. M at 7.

Plaintiffs filed suit on December 9, 2015, alleging violations of the First

---

[2] Both parties understand this to refer to the Supreme Court's campaign-finance-related decision in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010).

Amendment, the Fifth Amendment, and 39 U.S.C. § 403(c).  Compl. at 1.  USPS moved

to dismiss for lack of subject-matter jurisdiction on the basis that Plaintiffs were required

to exhaust their claims before the Postal Regulatory Commission, which has exclusive

jurisdiction to hear claims brought under § 403(c).  Def.'s Mot. to Dismiss, ECF No. 11-

1.  The Court granted Plaintiffs leave to file an Amended Complaint that excluded their

§ 403(c) claim.  Minute Order dated June 29, 2016.  USPS moved to dismiss Plaintiffs'

First Amended Complaint for lack of subject-matter jurisdiction, ECF No. 19, which the

Court denied on December 6, 2016, ECF No. 24.[3]  Discovery commenced on February 2,

2017, and involved document production by the parties and Zazzle, as well as two Rule

30(b)(6) depositions.  ECF Nos. 29, 34, 35.  Discovery closed on March 9, 2018.  ECF

No. 38.

Plaintiffs moved to file their motion for summary judgment under seal on May 16,

2018, and attached their motion as an exhibit.  ECF No. 43.  On June 28, 2018, Plaintiffs

filed a public version of their motion for summary judgment.  ECF No. 45.  Two weeks

later, however, Plaintiffs filed a motion seeking leave to file a supplemental complaint

setting forth "a facial First Amendment challenge to the new regulations' restrictions on

political speech."  Pls.' Unopposed Mot. for Leave to File Suppl. Compl. at 2, ECF No.

48.  The Court granted Plaintiffs' motion on July 18, 2018.  *See* Minute Order dated July

18, 2018.

Plaintiffs filed their Supplemental Complaint on July 19, 2018.  ECF No. 52.  In

their pleading, Plaintiffs discuss two pertinent developments that occurred on May 15,

---

[3] USPS respectfully disagrees with the Court's ruling.  In light of that ruling, however,
USPS does not address in this brief any of the jurisdictional arguments it previously
raised.

2018. First, as noted above, USPS's new regulations took effect on that date. Suppl. Compl. ¶ 2. As Plaintiffs acknowledge, those regulations "make numerous changes to the content guidelines for customized postage products," including limiting the permissible content used in the program only to "commercial" and "social" content that is suitable for all-ages audiences. *Id*. ¶ 3. These regulations constitute "the exclusive content guidelines for the [C]ustomized [P]ostage program." *Id*. (emphasis omitted). Second, also on May 15, 2018, Zazzle's authorization to participate in the program as a vendor and produce Customized Postage expired. *See id*. ¶ 4. Thus, currently, "Zazzle is not authorized to print customized postage products." *Id*.

With USPS's new regulations in place and Zazzle no longer authorized to sell or produce Customized Postage, Plaintiffs placed two orders for Customized Postage with Stamps.com, a different vendor in the program. Plaintiffs placed their first order on June 29, 2018, using a "substantively identical" design to that which Plaintiff Zukerman had originally submitted to Zazzle in April 2015. *Id*. ¶¶ 5, 6. In addition to the text, "Democracy is Not for Sale," this new design also included the text "But This Artwork Is!" and the name "Charles Krause Reporting Fine Art." *Id*. ¶ 6. Later that day, Stamps.com rejected Plaintiffs' order because the design "did not meet [its] content guidelines." *Id*. ¶ 7 (quoting Suppl. Compl. Ex. C). A week later, Plaintiffs placed another order with Stamps.com, again using a "substantively identical" design to that which Plaintiff Zukerman had originally used. *Id*. ¶ 8. Stamps.com rejected this order as well because the design "did not meet the 'content guidelines' in effect and applied by Stamps.com." *Id*. ¶ 9 (quoting Suppl. Compl. Ex. D).

## STANDARD OF REVIEW

When adjudicating a motion to dismiss pursuant to Rule 12(b)(1), "the Court must accept as true all of the factual allegations contained in the complaint." *Gordon v. Office of the Architect of the Capitol*, 750 F. Supp. 2d 82, 86 (D.D.C. 2010). However, a "court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion because subject-matter jurisdiction focuses on the court's power to hear the claim." *Adams v. U.S. Capitol Police Bd.*, 564 F. Supp. 2d 37, 40 (D.D.C. 2008); *see also Morrow v. United States*, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (noting that a Rule 12(b)(1) motion "presents a threshold challenge to the court's jurisdiction" (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987))). "[T]he plaintiff bears the burden of establishing that the court has subject-matter jurisdiction." *Adams*, 564 F. Supp. 2d at 40. When, however, a party asserts that a case is moot and thus should be dismissed under Rule 12(b)(1), the asserting party "generally bears the burden of establishing that [the] case is moot in the first instance." *Cierco v. Lew*, 190 F. Supp. 3d 16, 23 (D.D.C. 2016), *aff'd on other grounds sub nom. Cierco v. Mnuchin*, 857 F.3d 407 (D.C. Cir. 2017). "The party opposing a mootness challenge, in turn, 'bears the burden of showing an exception [to the mootness doctrine] applies.'" *Id.* (quoting *Honeywell Int'l, Inc. v. NRC*, 628 F.3d 568, 576 (D.C. Cir. 2010)) (alteration in original).

Under Rule 12(b)(6), a claim should be dismissed if it fails to state a claim upon which relief can be granted. To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  In applying this standard, courts first identify allegations that constitute mere legal conclusions, as they are not entitled to a presumption of truth.  *Id*. Indeed, "[t]hreadbare recitals of the elements of a cause of action" do not suffice.  *Id*. Second, courts presume the veracity of a plaintiff's well-pled factual allegations and assess whether they set forth a plausible claim under Rule 8(a).  *Id*.

## ARGUMENT

### I.      Plaintiffs' Original Claims Should Be Dismissed For Lack of Jurisdiction

The Court should dismiss for lack of jurisdiction Plaintiffs' original constitutional claims, as set forth in their Amended Complaint and incorporated into their Supplemental Complaint, which challenge the enforcement regime that preceded USPS's adoption of the current and "exclusive" regulatory scheme governing the Customized Postage program.  Suppl. Compl. ¶ 3(a).  Specifically, Plaintiffs claim that as a result of the Standardized Image Guidelines previously used by USPS to regulate the types of content permissible on Customized Postage, and as a result of Zazzle's conduct operating under those Guidelines, USPS transformed the program into what is described in First Amendment case law as a designated public forum.

USPS's Standardized Image Guidelines have, however, been superseded by regulation, and Zazzle is no longer an authorized vendor in the Customized Postage program.  As such, Plaintiffs' challenges to USPS's prior enforcement regime are clearly moot.  Nor are Plaintiffs entitled to any injunctive or declaratory relief on their original claims.  Even if Plaintiffs were correct—and they are not—that the Customized Postage program previously constituted a designated public forum, USPS was free to close the program as a nonpublic forum at any time and reserve it for only certain categories of speech, to the exclusion of others.  As explained in Part II *infra*, USPS's current

regulations do in fact establish a nonpublic forum.  As a consequence, the Court cannot

grant Plaintiffs the injunctive relief they request, which implicates Guidelines that are no

longer effective and a vendor that is no longer authorized to participate in the program.

Similarly, any declaratory relief would constitute nothing more than an advisory opinion

on a nonexistent enforcement regime with no practical effect on the rights of the parties.

### A.    Plaintiffs' Original Claims Challenge an Enforcement Regime that No Longer Exists

The Supreme Court has established a "'forum based' approach for assessing

restrictions that the government seeks to place on the use of its property," which

recognizes "three types of government-controlled spaces: traditional public forums,

designated public forums, and nonpublic forums."  *Minn. Voters All. v. Mansky*, 138 S.

Ct. 1876, 1885 (2018) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505

U.S. 672, 678 (1992)).  Traditional public forums "include[] public areas that have 'by

long tradition or by government fiat been devoted to assembly and debate," such as

sidewalks and public parks.  *Oberwetter v. Hilliard*, 639 F.3d 545, 551 (D.C. Cir. 2011)

(quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

Designated public forums are "spaces that have 'not traditionally been regarded as a

public forum' but which the government has 'intentionally opened up for that purpose.'"

*Minn. Voters All.*, 138 S. Ct. at 1885 (quoting *Pleasant Grove City v. Summum*, 555 U.S.

460, 469-70 (2009)).  In both types of public forums, the Government must satisfy strict

scrutiny to justify content-based regulations of speech.  *Id.*

"In a nonpublic forum, on the other hand—a space that 'is not by tradition or

designation a forum for public communication'—the government has much more

flexibility to craft rules limiting speech."[4]  *Id.* (quoting *Perry Educ. Ass'n*, 460 U.S. at

46).  This includes the right to reserve the forum "for the discussion of certain topics," to

the exclusion of others.  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819,

829 (1995); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 2018 WL

3625417, at *5 (D.C. Cir. July 31, 2018) ("[T]he government has wide latitude to restrict

subject matters—including those of great First Amendment salience—in a nonpublic

forum . . . ." (citations omitted)).  Such a restriction is permissible so long as "the

regulation on speech is reasonable and not an effort to suppress expression merely

because public officials oppose the speaker's view."  *Minn. Voters All.*, 138 S. Ct. at

1885 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46).

Plaintiffs' original constitutional challenges pertain to and arise from USPS's use

of Standardized Image Guidelines, with which vendors were required to comply under

their authorization agreements with USPS, and Zazzle's practices operating under those

Guidelines while it was a vendor in the program.  Specifically, they contend that Zazzle's

purported fulfillment of orders for Customized Postage containing political advocacy, in

violation of USPS's and Zazzle's own guidelines, transformed the program into a

designated public forum.  *See* Am. Compl. ¶ 43 (alleging that USPS "created and

designated a public customized-U.S.-postage-stamp forum); Am. Compl. ¶ 29 ("Zazzle

has often ignored those guidelines . . . by accepting and printing other designs that violate

Zazzle's stated content rules."); *see also* Pls.' Mem. of P. & A. in Supp. of Their Mot. for

---

[4] Certain types of nonpublic forums are often referred to as limited public forums, though
"no substantive legal distinction attaches to the terminological difference" between the
two terms.  *Am. Civil Liberties Union Found. v. Wash. Metro. Area Transit Auth.*, 303 F.
Supp. 3d 11, 17 n.3 (D.D.C. 2018).

Summ. J. at 22, ECF No. 45-1 (contending that by "consistently print[ing] customized

postage designs advocating political positions," in violation of USPS's Guidelines,

Zazzle "transform[ed] the customized postage program into a designated public forum").

As such, Plaintiffs assert that USPS's exclusion of political speech on Customized

Postage through its Standardized Image Guidelines violates the First and Fifth

Amendments because it discriminates on the basis of content and viewpoint.  *See* Am.

Compl. ¶ 44; *see also* Pls.' Mem. of P. & A. in Supp. of Their Mot. for Summ. J. at 18

("USPS's Customized Postage Guidelines Are Unconstitutional Content-Based Speech

Restrictions"); Pls.' Mem. of P. & A. in Supp. of Their Mot. for Summ. J. at 2 ("USPS's

own policies, and the policies that Zazzle followed (with USPS's acquiescence) in

implementing the customized postage program, amount to unconstitutional content- and

viewpoint-based discrimination.").

Those Guidelines, however, are no longer effective, as the authorizations to which

they were attached have expired, and USPS has codified new, more restrictive rules for

the program through regulation.  As Plaintiffs acknowledge, those regulations constitute

"the exclusive content guidelines for the customized postage program."  Suppl. Compl. ¶

3(a).  Additionally, USPS declined to reauthorize Zazzle's participation in the program,

which expired on May 15, 2018, and thus Zazzle currently lacks any authority to sell or

produce Customized Postage.  *See id.* ¶ 4 ("On or about May 15, 2018, Zazzle, Inc.'s . . .

authorization to serve as a vendor of customized postage products expired.  As of the

filing of this Supplemental Pleading, Zazzle is not authorized to print customized postage

products.").

The D.C. Circuit has made clear that, in a situation such as this, the adoption of

new, superseding regulations renders challenges to an agency's prior policy moot, even if

such regulations are codified in the midst of litigation challenging the prior policy.

"Federal courts lack jurisdiction to decide moot cases because their constitutional

authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v.

Heckler*, 464 U.S. 67, 70 (1983) (citation omitted).  Even if litigation "poses a live

controversy when filed," federal courts must nonetheless "refrain from deciding it if

events have so transpired that the decision will neither presently affect the parties' rights

nor have a more-than-speculative chance of affecting them in the future." *Am. Bar Ass'n

v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011).  Accordingly, under the voluntary-cessation

doctrine, a challenge to a superseded law is rendered moot in the absence of "evidence

indicating that the challenged law likely will be reenacted." *Nat'l Black Police Ass'n v.

District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (citations omitted).

No such evidence exists in this case, and the possibility that USPS might return to

the prior enforcement regime originally challenged by Plaintiffs is wholly speculative

and, in fact, unlikely to occur.  The current regulations are the product of a nearly twelve-

month rulemaking process, and they impose different substantive and procedural

requirements than did the prior Guidelines.  As discussed in greater detail below, USPS's

new regulations adopt a "default presumption" of "ineligibility . . . for all content

considered under the Eligibility Criteria," and specify only two narrow categories of

content—"commercial or social image[s] that [are] suitable for all-ages audiences"—that

may be used on Customized Postage.  82 Fed. Reg. at 60,118.  This was intended to

better effectuate the "original program purpose[]" of reserving the forum for "family-

friendly images or text that would not cause concern among mainstream, multi-

generational users of the mail."  *Id.*

As Plaintiffs acknowledge, the regulations effect "numerous changes to the content guidelines for customized postage products that were in effect when Plaintiffs first submitted their customized postage design in April 2015."  Suppl. Compl. ¶ 3.  This includes Zazzle's "Appropriate Use Guidelines for Zazzle Custom Stamps," which Plaintiffs cite in their Amended Complaint and which reflected Zazzle's attempt to comply with USPS's Standardized Image Guidelines.  *See, e.g.*, Am. Compl. ¶¶ 15, 28; *see also* Am. Compl. Ex. J.  For example, while those Appropriate Use Guidelines provide "[e]xamples of what is prohibited," such as "images and other content that '[a]dvocate or protest any social, political, legal, moral or religious agenda in a way that may appear controversial to others," Am. Compl. ¶ 15 (quoting Am. Compl. Ex. J), USPS's regulations take the opposite route by affirmatively specifying that only two categories of content may be permitted for use on Customized Postage—namely, "commercial or social image[s] that [are] suitable for all-ages audiences."  82 Fed. Reg. at 60,118.

USPS's regulations also differ from the prior enforcement regime in terms of procedure by imposing requirements designed to achieve greater vendor compliance and transparency.  Whereas content restrictions were previously imposed through Standardized Image Guidelines attached to vendors' authorization agreements, the new regulations require vendors to "make the Eligibility Criteria set forth in [39 C.F.R. § 501.21(b)] available to customers on [their] websites or in any other medium through which Customized Postage products are purchased" so that customers may be aware of the restrictions applied when vendors assess proposed Customized Postage designs.  39

C.F.R. § 501.21(c)(1).  In addition, vendors may only utilize those eligibility criteria in assessing a proposed Customized Postage design and may not give the appearance that any other eligibility criteria are being applied.  39 C.F.R. § 501.21(c).  Again, this was not the case under the prior enforcement regime, where "inconsistency of publicly available provider content guidelines . . . caused confusion over Customized Postage products" and the types of content that were eligible for use.  82 Fed. Reg. at 60,118.

There is, accordingly, no basis on which to find it likely that USPS will vacate its recently enacted rule and return to using its Standardized Image Guidelines, as opposed to enforcing the current regulations with their more exacting and specific requirements. There is similarly no basis on which to deem it likely that USPS will permit Zazzle, which currently lacks any authority to sell or produce Customized Postage, to return to the program as a vendor and reinstitute any of the policies (as characterized by Plaintiffs) it may have previously adopted, in violation of USPS's Guidelines.  The "mere power" of USPS to return to a prior regime is insufficient to demonstrate that a live case or controversy still exists—rather, there must be "evidence in the record" that such a change is likely.  *Nat'l Black Police Ass'n*, 108 F.3d at 349.

The Court should therefore dismiss the instant challenge as moot, as prior courts in this circuit have done in similar situations.  For example, in *Initiative & Referendum Institute v. U.S. Postal Service*, 685 F.3d 1066 (D.C. Cir. 2012), the D.C. Circuit held that the appellants' challenge to a prior version of a USPS regulation was mooted by USPS's amendment of that regulation during litigation.  *Id*. at 1074.  Noting the "implausib[ility] that the Postal Service would have gone through the cumbersome process of amending its regulation . . . only to re-amend the regulation after this case is resolved," the D.C.

Circuit agreed with the district court that the claim was moot, noting that "[a]t this point, 'declaratory and injunctive relief would no longer be appropriate.'" *Id*. (quoting *Nat'l Black Police Ass'n*, 108 F.3d at 350); *see also Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc*., 404 U.S. 412, 414 (1972) (no court could grant "[t]he only relief sought in the complaint"—namely, a declaratory judgment and injunctive relief—where statute at issue was repealed, and thus plaintiff's challenge was moot); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016) ("Because that regulation no longer exists, we can do nothing to affect Akiachak's rights relative to it, thus making this case classically moot for lack of a live controversy."); *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 18 (1st Cir. 2002) (where the Massachusetts Port Authority revised its policy regarding leafletting, the revision rendered that portion of the appellant's claim moot, and holding that because the appellant "seeks only injunctive and declaratory relief, not damages . . . it would be pointless either to enjoin the enforcement of a regulation that is no longer in effect or to declare its constitutional status" (citation omitted)).

The same conclusion was reached by the district court in *American Freedom Defense Initiative v. Wash. Metro. Transit Auth*., 245 F. Supp. 3d 205 (D.D.C. 2017), which involved a challenge to the Washington Metropolitan Transit Authority's ("WMATA") ban on issue-oriented advertising (including political advertising) on buses and in subway stations. *Id*. at 208-09. The plaintiff had submitted a proposed ad to WMATA showing a likeness of the Prophet Muhammad wielding a sword and saying "You can't draw me!", below which was an image of a person's hand holding a pen and saying in reply, "That's why I draw you." *Id*. at 209. Above all of this was the text

"SUPPORT FREE SPEECH."  *Id.*  Although WMATA had previously permitted the

publication of such ads, *see id.* at 211 n.1, shortly after the plaintiff's submission, the

WMATA Board of Directors adopted a moratorium closing WMATA's advertising space

to issue-oriented ads.  *Id.* at 209.  The plaintiff's proposed ad was rejected under that

moratorium.  *Id.*  The district court held that "[t]o the extent that Plaintiff brings [its]

claims under WMATA's pre-May 28, 2015 policy which permitted the publication of

issue-oriented ads on WMATA's property, WMATA's May 28 Moratorium mooted any

such claim."  *Id.* at 211 n.1 (citation omitted); *see also Am. Freedom Def. Initiative v.*

*Metro. Transp. Auth.*, 815 F.3d 105, 110 (2d Cir. 2016) (affirming a finding of mootness

that where the Metropolitan Transportation Authority ("MTA") amended its advertising

standards during litigation, as "any restriction on [the plaintiff's] speech at this time is a

consequence of the MTA's new advertising policy, not a relic of its old one").

Indeed, the case for mootness is even stronger here than it was in *Initiative &*

*Referendum Institute* and *American Freedom Defense Initiative* because not only has

USPS superseded its prior use of Standardized Image Guidelines by regulation, it has

declined to reauthorize Zazzle's participation in the program as a vendor.  Plaintiffs'

original claims rest on Zazzle's rejection of Plaintiff Zukerman's order due to its political

content where Zazzle had allegedly fulfilled other orders for Customized Postage

containing similar content, even where such orders violated USPS's and Zazzle's

guidelines.  *See* Am. Compl. ¶¶ 1, 28, 29.  As previously noted, however, Zazzle is no

longer an authorized vendor in the program, and Plaintiffs proffer no allegations of

discriminatory conduct by any other vendor.  This renders it even less likely—to the

extent there is any likelihood at all—that USPS will return to the regime that existed at

the time of Plaintiffs' Amended Complaint.

**B.      Plaintiffs Are Not Entitled to Injunctive Relief or Declaratory Relief on Their Original Claims**

As noted above, Plaintiffs' original claims assert that the Customized Postage program became a designated public forum as a result of Zazzle's non-adherence to USPS's Standardized Image Guidelines.  *See* Am. Compl. ¶¶ 29, 43.  Even accepting, however, Plaintiffs' argument as true that the Customized Postage program *used to* constitute a designated public forum, the *current* regulations have closed the program as a nonpublic forum for reasons discussed in more detail *infra*.  Consequently, Plaintiffs' original claims are moot and do not entitle them to any relief.

A designated public forum is one that the government "was not required to create . . . in the first place," and thus, it "is not required to indefinitely retain the open character of the [forum]."  *Perry Educ. Ass'n*, 460 U.S. at 45-46 (citations omitted).  Accordingly, even where the Government previously opens a designated public forum, "it may instead choose to convert [the] designated public forum back into a non-public forum because 'the government retains the choice' regarding the status of its forum."  *Archdiocese of Wash.*, 2018 WL 3625417, at *4 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998)); *see also Am. Civil Liberties Union v. Mineta*, 319 F. Supp. 2d 69, 83 n.4 (D.D.C. 2004) (noting that "WMATA [could] close [advertising space in the WMATA system] as a designated public forum and thus constitutionally refuse to accept the advertisements in question by eliminating entire categories of advertisements"); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 77 (1st Cir. 2004) (the Government is "free to change the nature of any nontraditional forum as it wishes" (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 802 (1985))); *United States v.*

21

*Bjerke*, 796 F.2d 643, 647 (3d Cir. 1986) (noting that "officials may choose to close . . . a designated public forum at any time" (citing *Perry Educ. Ass'n*, 460 U.S. at 46)).

 Thus, even accepting Plaintiffs' errant premise that under USPS's Standardized Image Guidelines and Zazzle's practices as a vendor, the Customized Postage program previously operated as a designated public forum, USPS was nonetheless free to close—and, indeed, did close—the program as a nonpublic forum through its new regulations and reserve it for only certain categories of speech. *See* 82 Fed. Reg. at 60,118. The D.C. Circuit affirmed the propriety of such an action just last month in *Archdiocese of Washington v. WMATA*. As the court noted, until 2015, WMATA "had accepted most issue-oriented advertisements, including political, religious, and advocacy ads." *Archdiocese of Wash.*, 2018 WL 3625417, at *2. After receiving "near-monthly complaints from its employees, riders, elected officials, and community and business leaders about its advertisements," the WMATA Board of Directors "decided to narrow the subjects that it would accept in WMATA advertising space" and adopted Guidelines Governing Commercial Advertising, which closed that advertising space "to issue-oriented ads, including political, religious and advocacy ads." *Id.* Based on this action, the D.C. Circuit deemed it "clear that WMATA's advertising space [was] a non-public forum," because even though WMATA previously "treated its advertising space as an open forum," it had decided based on its experience to "'close[]' its advertising space to specific subjects." *Id.* at *4. Thus, even though the D.C. Circuit had previously found in a prior case that WMATA had designated its subway stations as a public forum, WMATA was nonetheless entitled to close the forum and did so "in the manner contemplated by the Supreme Court." *Id.*

Thus, even accepting Plaintiffs' characterization of the prior state of the Customized Postage program, USPS has clearly closed it as a nonpublic forum under its new regulations.  As a result, Plaintiffs would not be entitled to any relief on their original claims even if they were to prevail on the merits, and the claims should be dismissed as moot.  Regarding declaratory relief, it would be "pointless" to "declare [the] constitutional status" of policies and practices that are no longer in effect, especially where the fundamental nature of those policies and practices have changed.  *New England Reg'l Council of Carpenters*, 284 F.3d at 18.  Indeed, any such declaratory judgment would constitute nothing more than an advisory opinion on a regime no longer in existence.  As for injunctive relief, Plaintiffs are not entitled to the relief they seek— namely, an order requiring the issuance of Customized Postage with Plaintiffs' desired design.  Am. Compl. at 17.  The previous existence of a designated public forum does not entitle a prior participant in that forum to engage in their desired expressive activity *after* the forum has been closed as a nonpublic forum.  Rather, the opposite is true: "A government is entitled to close a designated public forum to *all* speech."  *Sons of Confederate Veterans, Va. Div. v. City of Lexington*, 722 F.3d 224, 232 (4th Cir. 2013) (emphasis added); *see also Currier v. Potter*, 379 F.3d 716, 728 (9th Cir. 2004) (noting the Government may close a designated public forum altogether "whenever it wants" (citing *Perry Educ. Ass'n*, 460 U.S. at 46)).

## II.    The Regulations Governing the Customized Postage Program Establish a Nonpublic Forum Within Which USPS Is Permitted to Exclude Categories of Speech, Including Political Speech

In the only claim over which this Court maintains jurisdiction, Plaintiffs assert that the restrictions on political speech contained in USPS's current regulations, on their face, violate the First Amendment.  *See* Suppl. Compl. ¶ 11; *see also* Pls.' Unopposed

Mot. for Leave to File Suppl. Compl. at 2.  "Facial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).  Accordingly, Plaintiffs "confront 'a heavy burden' in advancing their claim."  *Id*. (quoting *Rust v. Sullivan*, 500 U.S. 173, 183 (1991)).  To prevail on their facial challenge, Plaintiffs "must demonstrate a substantial risk that application of the provision will lead to the suppression of speech."  *Id*.

Plaintiffs cannot carry that weighty burden here.  As the D.C. Circuit recently emphasized, the Government may create a forum for its own purposes and reserve it for only certain categories of speech, to the exclusion of others.  Imposition of such content restrictions is permissible under the First Amendment so long as the restrictions are reasonable and viewpoint neutral.  In adopting the new regulations, USPS established just such a nonpublic forum, and its exclusion of political content from the forum both reasonably serve USPS's interests and is viewpoint neutral.  Accordingly, Plaintiffs' facial challenge to USPS's regulations should be dismissed under Rule 12(b)(6).

### A.      USPS Expressed Its Clear Intent to Create a Nonpublic Forum

As discussed above, the Supreme Court distinguishes between three types of Government-controlled forums: traditional public forums, designated public forums, and nonpublic forums.  *Minn. Voters All.*, 138 S. Ct. at 1885.  While the Government must satisfy strict scrutiny to justify content-based limitations on speech in traditional and designated public forums, "the government has much more flexibility to craft rules limiting speech" in a nonpublic forum.  *Id.*  For example, "the government has wide latitude to restrict subject matters—including those of great First Amendment salience—

24

in a nonpublic forum." *Archdiocese of Wash.*, 2018 WL 3625417, at *5 (citations

omitted).  Such a restriction is permissible so long as "the regulation on speech is

reasonable and not an effort to suppress expression merely because public officials

oppose the speaker's view." *Minn. Voters All.*, 138 S. Ct. at 1885 (quoting *Perry Educ.

Ass'n*, 460 U.S. at 46).

This "distinct standard of review" reflects the fact that the Government, "'no less

than a private owner of property,' retains the 'power to preserve the property under its

control for the use to which it is lawfully dedicated.'" *Id.* (quoting *Adderley v. Florida*,

385 U. S. 39, 47 (1966)); *see also Archdiocese of Wash.*, 2018 WL 3625417, at *5 ("The

government need not be forced into the choice between 'the prospect of cacophony, on

the one hand, and First Amendment liability, on the other.'" (quoting *Ark. Educ.

Television Comm'n*, 523 U.S. at 681)).  Accordingly, the Supreme Court "ha[s] long

recognized that the government may impose some content-based restrictions on speech in

nonpublic forums, including restrictions that exclude political advocates and forms of

political advocacy."[5] *Minn. Voters All.*, 138 S. Ct. at 1885-86; *see also Archdiocese of

Wash.*, 2018 WL 3625417, at *6 (noting that "the Supreme Court has upheld bans against

constitutional challenges" where the bans restricted "political speech").

"The government does not create a public forum by inaction or by permitting

limited discourse, but only by *intentionally* opening a nontraditional forum for public

discourse." *Cornelius*, 473 U.S. at 802 (emphasis added).  Accordingly, "[t]he

---

[5] There is, for example, "decades of settled doctrine permitting governments to run transit companies without establishing forums for debate on the controversial issues of the ages and of the day, including not only the subject of religion but also politics and advocacy issues." *Archdiocese of Wash*, 2018 WL 3625417, at *14.

touchstone for determining whether government property is a designated public forum is the government's intent in establishing and maintaining the property." *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988).  Courts "will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will [they] infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Cornelius*, 473 U.S. at 803.  As the D.C. Circuit and the First Circuit have noted, "deference to government intent in determining the nature of the forum may promote, rather than hinder, First Amendment principles." *Ridley*, 390 F.3d at 79.

> [W]e encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all.  That this distinction turns on governmental intent does not render it unprotective of speech.  Rather, it reflects the reality that, with the exception of traditional public fora, the government retains the choice of whether to designate its property as a forum for specified classes of speakers.

*Archdiocese of Wash.*, 2018 WL 3625417, at *5 (quoting *Ark. Educ. Television Comm'n*, 523 U.S. at 680); *see also Ridley*, 390 F.3d at 80 (quoting this same language).

USPS made clear in its final rule that it intended for the Customized Postage program to operate as a nonpublic forum.  Its new regulations expressly reserve the forum for only two, narrowly drawn categories of content—namely, commercial content and social content that are "family-friendly" and suitable for "mainstream, multi-generational users of the mail."  82 Fed. Reg. at 60,118.  This is "because Customized Postage products have potential to create significant risks for Postal Service philatelic programs and brand interests."  *Id.*  Thus, to "comport with program purposes," USPS's regulations also set forth a non-exhaustive, illustrative list of categories of content that

are prohibited for use in Customized Postage, including political, religious, and sexual content; non-incidental depictions of alcohol and firearms; and depictions of controlled substances. *Id.*

These "significant substantive content limitations and procedural limitations on the [content] it would accept" render it "unlikely" that USPS intended in its new regulations to open a designated public forum. *Ridley*, 390 F.3d at 77. Indeed, nothing in USPS's final rule or regulations reflects any desire by USPS to make the program "'generally available' 'for expressive use by the general public.'" *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008) (quoting *Ark. Educ. Television Comm'n*, 523 U.S. at 677). Rather, the opposite is true.[6] Through the current regulations, USPS imposed a "default presumption" of "ineligibility" for all content proposed for use on Customized Postage, and thus a Customized Postage vendor must find that the content of a design is "expressly allowed" under the new regulations or it is "presumed to be prohibited." 82 Fed. Reg. at 60,118. "Such selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." *Cornelius*, 473 U.S. at 805.

The case law and principles USPS cited in its final rule further eliminate any doubt as to the type of forum it intended to create. First, USPS cited *Matal v. Tam*, 137 S. Ct. 1744 (2017), in stating that "[t]he First Amendment requires that such content- or speaker-based restrictions be reasonable and viewpoint-neutral." *Id*. at 60,117. Under the portion of *Matal* cited for this proposition, such requirements apply where "a unit of government creates a limited public forum for private speech." 137 S. Ct. at 1763.

---

[6] Indeed, USPS's "declared intent" from the outset was "*not* to allow its Customized Postage program to become a public forum for dissemination, debate, or discussion of public issues." 71 Fed. Reg. at 12,719 (emphasis added).

Second, USPS specifically noted that it sought through the new regulations to "[e]xclud[e] entire categories of content altogether to help avoid unlawful viewpoint discrimination."  82 Fed. Reg. at 60,117.  This type of content restriction is only permissible in a nonpublic forum.  *See Rosenberger*, 515 U.S. at 830 (noting that "content discrimination" is permissible in a nonpublic forum "if it preserves the purposes of that limited forum").  Thus, by referencing and drawing on case law dealing with nonpublic forums, USPS evinced its intent to create, and its belief that it was creating, a nonpublic forum.

### B.     Other Objective Indicia of USPS's Intent Confirm that USPS Intended to Create a Nonpublic Forum

Also relevant to this analysis are other "'objective indicia of [the Government's] intent,' such as 'the nature of the property, its compatibility with expressive activity, and the consistent policy and practice of the government.'"  *Bryant*, 532 F.3d at 896 (citation omitted) (quoting *Stewart*, 863 F.2d at 1016-17).  In assessing the first two factors, courts consider the Government's purpose in establishing the forum and the context in which speech in that forum would be heard and received.  *See, e.g.*, *Cornelius*, 473 U.S. at 804-05 (considering the Government's reason for launching the Combined Federal Campaign); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303-04 (1974) (noting that the city's mass transit system served as a means of public transportation and operated as a commercial venture); *Initiative & Referendum Inst.*, 685 F.3d at 1071-72 (considering the "location, purpose, and history of interior postal sidewalks," which "show that they are not public forums"); *Hopper v. City of Pasco*, 241 F.3d 1067, 1078 (9th Cir. 2001) (determination of whether "expressive activity is consistent with the principal function of the forum" requires consideration of "the context of the property as a whole").

The first two factors militate against any finding that USPS intended through the new regulations to open a designated public forum. *See Initiative & Referendum Inst.*, 685 F.3d at 1071 (noting where the "government has dedicated property to a use inconsistent with conventional public assembly and debate then the inconsistency precludes classification as a public forum" (citing *Oberwetter*, 639 F.3d at 552)). USPS launched the program with the goal of generating revenue. *See* Request of the United States Postal Service to Add Postal Products to the Mail Classification Schedule in Response to Order No. 154, Ex. D at 1, *Modification of Mail Classification Schedule Product Lists in Response to Order No. 154*, No. MC2009-19 (Postal Regulatory Comm'n Mar. 10, 2009) (citing 39 U.S.C. § 3622(b)(5) as the objective of the Customized Postage program). The program does so through the sale of Customized Postage, for which USPS receives the face value of the postage, and through the payment of an annual authorization fee by Customized Postage vendors. *See* 39 C.F.R. § 501.21(c)(5).

This use of the program "as a commercial enterprise [is] inconsistent with an intent to [create] a public forum." *Cornelius*, 473 U.S. at 804; *see also Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 498 (9th Cir. 2015) ("[U]se of . . . property as part of a commercial enterprise is generally incompatible with granting the public unfettered access for expressive activities."); *Ridley*, 390 F.3d at 79 (distinguishing programs intended to "generate revenue" from those intended to "facilitate expression"); *Perry v. McDonald*, 280 F.3d 159, 167 (2d Cir. 2001) ("Nothing about the revenue-raising aim of the vanity-plate regime suggests that Vermont intended to 'create a forum for unlimited public expression.'" (quoting *DiLoreto v. Downey Unified Sch. Dist. Bd. of*

*Educ.*, 196 F.3d 958, 966 (9th Cir. 1999))); *cf. Archdiocese of Wash.*, 2018 WL 3625417, at \*9 ("The Supreme Court . . . has rejected the view that accepting commercial advertising 'create[s] a forum for the dissemination of information and expression of ideas . . . .'" (quoting *Lehman*, 418 U.S. at 310, 315 (Brennan, J., dissenting)) (additional citations omitted)).

Additionally, the risk inherent in the program that individuals might misattribute content in Customized Postage to USPS is incompatible with any finding that USPS intended for the program to operate as a designated public forum for general debate and discussion.  USPS noted in its final rule that individuals might mistakenly attribute Customized Postage designs to USPS, or otherwise assume that USPS endorsed or is affiliated with the content it contains.[7]  *See* 82 Fed. Reg. at 60,118 (noting possible "consumer confusion related to the status of Customized Postage products").  This is because Customized Postage "share[s] the function and appearance of U.S. stamps."  *Id.* at 60,117.  Indeed, from the perspective of a consumer, Customized Postage fulfills the same purpose as U.S. postal stamps: when affixed to a letter or parcel, Customized Postage enables an individual to send that letter or parcel through the U.S. mail system.  There are also similarities in appearance, with content layouts and perforated borders that mimic postal stamps, and currency denominations that mirror those of postal stamps.  *See* Am. Compl. ¶¶ 1, 24, 25, 30, 42.  These resemblances between Customized Postage and postal stamps, both in form and function, lead to a foreseeable risk that users of

---

[7] Again, USPS identified this risk at the outset of the program.  *See* 70 Fed. Reg. at 21,822 (expressing concern about "the likelihood that the public [would] be misled into believing that the product image [in Customized Postage] originated with the Postal Service").

Customized Postage and recipients of mail sent via Customized Postage might mistake it for a postal stamp or erroneously believe that USPS participated in the design of, is in some way affiliated with, or otherwise endorsed the content in a particular Customized Postage design. *See* 82 Fed. Reg. at 60,117 (expressing concerns about "false attribution" and "appearances of endorsement" of Customized Postage designs by USPS).

Indeed, these risks are particularly pronounced with regard to Customized Postage.  As discussed above, USPS regulations mandate a "1/2-inch clear zone to the left of and below" the payment indicia in PC postage.  USPS, Domestic Mail Manual, § 604.4.3(b).  The *only* exception to this "clear zone"-rule is Customized Postage, which permits the placement of graphic content within that half-inch area.  *See id*.  In all other instances of PC postage, this area is left blank.  As a result, Customized Postage products bear a greater resemblance to U.S. postal stamps than any other type of U.S. postage.

Accordingly, USPS took steps in its final rule to "protect official USPS stamps and philatelic products and programs from consumer confusion related to the status of Customized Postage products," including a requirement that vendors make efforts to "disassociate Customized Postage products from U.S. stamps."  82 Fed. Reg. at 60,118. If, however, despite such steps, misattribution nonetheless occurs, USPS's regulations impose "limit[s] [on] eligible private content," including the "[e]xclu[sion] [of] entire categories of content," in order to "protect its own business and brand interests against dilution, false attribution, appearances of endorsement, and other potential impacts."  *Id*. at 60,117.

The nature of the forum and its incompatibility with expressive activity, the risks posed by Customized Postage to USPS's business and brand interests, and the

31

preventative measures taken by USPS to mitigate such risks are all incompatible with a finding that USPS intended for the Customized Postage program to operate as a forum for full-fledged public debate on any issue, regardless of what political, religious, violent, or sexual content it might contain.  "As with any business, when the government is engaged in commerce, 'allowing certain expressive activity might harm advertising sales or tarnish business reputation.'"  *Seattle Mideast Awareness Campaign*, 781 F.3d at 498 (quoting *Hopper v. City of Pasco*, 241 F.3d 1067, 1081 (9th Cir. 2001)).  Accordingly, USPS is "entitled to some discretion in determining" the type of content that is "likely to alienate [customers] and cost it revenue."  *Ridley*, 390 F.3d at 95.  This is especially true where consumers have more communication options than ever, both in terms of digital communication (such as email and web marketing) and physical communications (with competitors such as FedEx, UPS, and DHL).  *Cf. United States v. Kokinda*, 497 U.S. 720, 732 (1990) (plurality) (noting that "the mail service market is becoming much more competitive").  USPS thus made the reasonable judgment that, in light of the nature and context of the forum, it was necessary to draw "distinctions based upon content in order to preserve the [forum] for the intended use of generating revenue," which it is entitled to do in a nonpublic forum.  *Uptown Pawn & Jewelry, Inc. v. City of Hollywood*, 337 F.3d 1275, 1279 (11th Cir. 2003) (citation omitted).

Finally, the third objective indicia of the Government's intent in determining the nature of a forum is "the consistent policy and practice of the government."  *Bryant*, 532 F.3d at 896 (quoting *Stewart*, 863 F.2d at 1016-17) (emphasis omitted).  Where the Government has issued new regulations governing a forum, this factor considers only the Government's policy and practice in enforcing the new regulations, and not the

enforcement of any regulations or guidelines that may have existed previously.  *See Am. Freedom Def. Initiative v. WMATA*, 245 F. Supp. 3d 205, 213 (D.D.C. 2017) ("[H]aving established that WMATA was permitted to change its guidelines, the relevant inquiry is not whether WMATA allowed other controversial messages before the May 28 Moratorium, *but whether WMATA has consistently enforced the new guidelines since they were enacted*." (emphasis added)).  Plaintiffs' challenge to USPS's new regulations is a facial one.  As a consequence, there is no evidence before the Court as to USPS's policy and practice regarding the program since adopting the new regulations, which, again, is the only evidence that would be relevant.[8]  As such, this factor is neutral and provides no support for concluding that, despite USPS's explicit declarations of intent to the contrary, USPS nonetheless intended to open the program as a designated public forum.

## C.   The Exclusion of Political Content in USPS's Regulations Is Reasonable and Viewpoint Neutral

Because the new regulations establish a nonpublic forum, USPS is permitted to reserve the forum for certain categories of speech, to the exclusion of others, so long as those restrictions are "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Minn. Voters All.*, 138 S. Ct. at 1885 (quoting *Perry Ed. Ass'n*, 460 U.S. at 46).  Both are true of USPS's regulations.

### i.   *The Restriction on Political Content Reasonably Serves USPS's Interests*

In a nonpublic forum, restrictions on speech "need only be reasonable," and not

---

[8] As noted in Plaintiff's Unopposed Motion for Leave to File Supplemental Complaint, ECF No. 48, the parties agreed that "no further discovery is necessary in light of the facial challenge raised to the new regulations."

"the most reasonable or the only reasonable limitation." *Hodge v. Talkin*, 799 F.3d 1145, 1165 (D.C. Cir. 2015) (quoting *Cornelius*, 473 U.S. at 808). "The reasonability inquiry is not a demanding one, but rather is a 'forgiving test.'" *Archdiocese of Wash.*, 2018 WL 3625417, at *10 (quoting *Minn. Voters Alliance*, 138 S. Ct. at 1888). The Government must simply show that its content restriction is "consistent with the government's legitimate interest in maintaining the property for its dedicated use." *Id.* at *10, *17 (citations omitted). For the reasons discussed at Part II.B *supra*, USPS's exclusion of political speech from the program reasonably serves USPS's legitimate interest in avoiding potential misattribution of the content in Customized Postage to USPS, especially where misattribution could harm USPS's brand and business equities.

In addition to those interests, USPS's restriction on political content reasonably serves USPS's "particularly weighty" governmental interest in avoiding political entanglement, "given the history of the Postal Service and its problematic historical associations with partisan politics." *Del Gallo v. Parent*, 557 F.3d 58, 73 (1st Cir. 2009). "Through much of its history, the post office was closely tied to partisan politics." *Id.* at 62. "Congress recognized that partisan political entanglement was one of the foremost problems facing the post office," which "contributed to inefficiencies and to problems in rate setting and management." *Id.* at 63 (citations omitted). "Congress was also concerned with the effect that the connection between electoral politics and the post office had on public perception." *Id.* (citation omitted). Through the Postal Reorganization Act of 1970, "Congress sought to have 'the Post Office . . . taken out of politics and politics out of the Post Office'" by establishing institutional buffers designed to "insulate the Postal Service from electoral politics." *Id.* at 63-64 (quoting H.R. Rep.

No. 91–1104, *reprinted in* 1970 U.S.C.C.A.N. at 3654).

Excluding political content from the Customized Postage program serves similar interests, and it represents one of many steps USPS has taken over the years to avoid actual or perceived political entanglement, as Congress intended. *See, e.g.*, *Longo v. U.S. Postal Serv.*, 953 F.2d 790, 794 (2d Cir. 1992) ("The primary justification for the prohibition against campaigning on postal property is that it enables the Postal Service to avoid both actual entanglement in partisan politics and the appearance of political favoritism," without which, "[p]ostmasters . . . would be hard pressed to avoid the sort of embroilment in partisan politics that Congress tried to prevent when it reorganized the Postal Service in 1970." (citation omitted)), *vacated on other grounds*, 506 U.S. 802 (1992).  As other courts of appeals have concluded, such actions are clearly reasonable. *See Del Gallo*, 557 F.3d at 73 ("The Postal Service could reasonably conclude that in order to fulfill its mandate of maintaining an efficient, nationwide system of postal services, and in order to be viable as a business in an increasingly competitive market, it would need to shed its past image of an institution affiliated with particular candidates or parties and not regain such an image." (citations omitted)).

It is also worth noting that Plaintiffs had multiple alternative means by which they could have engaged in their desired speech, without using Customized Postage as the vehicle for that speech and without any risk of misattribution of that content to USPS. Plaintiffs could have, for example, printed postcards or envelopes with their proposed artwork on it for use in the mail.  No person would reasonably attribute to USPS the speech on the back of a postcard or printed on an envelope, simply because USPS delivers those communications through the mail—indeed, private parties have long used

postcards and branded envelopes for their own promotional or advertising purposes, and Plaintiffs could have easily done the same.  The existence of such alternative channels for Plaintiffs' desired speech serves to confirm the reasonableness of USPS's regulations. *See, e.g.*, *Perry Educ. Ass'n*, 460 U.S. at 53 ("[T]he reasonableness of the limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place."); *Hodge*, 799 F.3d at 1169 ("[I]t is a mark in favor of the statute's reasonableness that the barred activity can be undertaken in an adjacent forum . . . .").

### ii.      The Restriction on Political Content Is Viewpoint Neutral

The exclusion of political content from Customized Postage products is also facially viewpoint neutral.  The text of USPS's regulations evinces no "effort to suppress expression merely because public officials oppose the speaker's view."  *Minn. Voters All.*, 138 S. Ct. at 1885 (quoting *Perry Ed. Ass'n*, 460 U.S. at 46).  Rather, "*[a]ny* depiction of political . . . content" is excluded from the program, regardless of viewpoint. 39 C.F.R. § 501.21(b)(2)(iii) (emphasis added).  Consequently, as the D.C. Circuit has found, "[i]nsofar as [Plaintiffs] make[] a claim of facial viewpoint discrimination, [their] claim is patently unfounded because . . . [§ 501.21(b)(2)(iii)] by its terms does 'not distinguish between political viewpoints.'"  *Bryant*, 532 F.3d at 897-98; *see also Kokinda*, 497 U.S. at 736 (finding that USPS's "regulation does not discriminate on the basis of . . . viewpoint" because "'[b]y excluding all . . . groups from engaging in [solicitation] the Postal Service is not granting to one side of a debatable public question . . . a monopoly in expressing its views'" (quoting *Monterey Cnty. Democratic Cent. Comm. v. U.S. Postal Serv.*, 812 F.2d 1194, 1198-1199 (9th Cir. 1987))); *Oberwetter*, 639 F.3d at 553 ("The Regulations plainly do not discriminate on the basis of viewpoint, but

rather prohibit disruptive speech regardless of its message."); *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 116 F. Supp. 2d 65, 75 (D.D.C. 2000) ("The regulation is clearly viewpoint-neutral in that it does not restrict speech because of a disagreement with a particular point of view but rather applies to all viewpoints equally." (citation omitted)).  Accordingly, USPS's regulations "do not engender the kind of directed viewpoint discrimination that would prompt [the] Court to invalidate [them] on [their] face." *Finley*, 524 U.S. at 583.

Nor is there any basis for concluding that the exclusion of political content from Customized Postage constitutes viewpoint discrimination because it excludes political points of view or political perspectives.  In a trio of cases—*Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), *Rosenberger v. Rector & Visitors of University of Virginia*, and *Good News Club v. Milford Central School*, 533 U.S. 98 (2001)—the Supreme Court struck down restrictions on speech where they excluded speech from a religious point of view on a topic that was otherwise permissible within the forum.  *See Good News Club*, 533 U.S. at 108, 111-12 ("reaffirm[ing] [its] holdings in *Lamb's Chapel* and *Rosenberger* that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint").

These cases do not divest the Government of the ability to exclude entire *categories of speech* from a nonpublic forum, such as political speech.[9]  Indeed, the

---

[9] Such a suggestion would not only contravene *Lehman v. City of Shaker Heights*, in which a plurality of the Supreme Court upheld a ban on political advertising in the cars of the city's public transit system, 418 U.S. at 304, it would also conflict with the Supreme Court's recent acknowledgment that its "decisions have long recognized that the

Supreme Court in *Rosenberger* expressly distinguished such a situation from the facts of

that case, noting that "the University *does not exclude religion as a subject matter* but

selects for disfavored treatment those student journalistic efforts with religious editorial

viewpoints." *Rosenberger*, 515 U.S. at 831 (emphasis added); *see also* 515 U.S. at 831

("The prohibited perspective, *not the general subject matter*, resulted in the

[University's] refusal to make third-party payments, for the subjects discussed were

otherwise within the approved category of publications." (emphasis added)).  Thus, as the

Eleventh Circuit has noted, *Rosenberger* "presupposes the legitimacy of content-based

regulations in a limited public forum."  *Bannon v. Sch. Dist. of Palm Beach Cty.*, 387

F.3d 1208, 1216 n.5 (11th Cir. 2004).

   In any event, the D.C. Circuit's recent decision in *Archdiocese of Washington v.*

*WMATA* forecloses any conclusion that USPS's regulations constitute facial viewpoint

discrimination under *Lamb's Chapel*, *Rosenberger*, and *Good News Club*.  *Archdiocese*

*of Washington* involved a regulation by WMATA that "proscribe[d] advertisements on

the entire subject matter of religion."  2018 WL 3625417, at *6.  The appellants argued

that this prohibition violated the First Amendment under *Lamb's Chapel*, *Rosenberger*,

and *Good News Club* because "it suppresses the [appellants'] religious viewpoint on

subjects that are otherwise includable in the forum."  *Id.*  The D.C. Circuit flatly

disagreed.  Reviewing *Lamb's Chapel*, *Rosenberger*, and *Good News Club*, the D.C.

---

government may impose some content-based restrictions on speech in nonpublic forums,
including restrictions that exclude political advocates and forms of political advocacy."
*Minn. Voters All.*, 138 S. Ct. at 1885-86; *see also Archdiocese of Wash*, 2018 WL
3625417, at *6 (noting that "the Supreme Court has upheld bans against constitutional
challenges" where the bans restricted "political speech").

Circuit concluded that the cases simply stand for the proposition that the Government may not "exclude religious viewpoints on otherwise includable topics."[10]  *Id.*; *see also* 2018 WL 3625417, at *16 (Wilkins, J., concurring) (interpreting *Lamb's Chapel*, *Rosenberger*, and *Good News Club* to "involve[] rules that permitted private speakers to discuss categories A, B, and C, but when a speaker sought to discuss C from a pro-religious perspective, they were improperly prohibited from doing so").

On this understanding, the D.C. Circuit concluded that WMATA's categorical exclusion of religious speech did not constitute impermissible viewpoint discrimination because, unlike in *Lamb's Chapel*, *Rosenberger*, and *Good News Club*, "the subjects on which the [appellants] claim they wish to speak through advertisements on WMATA buses are either not subjects within the forum or are not subjects on which they have shown they could not speak under [WMATA's Guidelines]."  *Id.* at *9.  Put differently, the appellants' intended speech "[did] not represent an excluded viewpoint on an

---

[10] This interpretation of *Lamb's Chapel*, *Rosenberger*, and *Good News Club* is widely shared by courts outside this circuit.  *See, e.g.*, *Cogswell v. City of Seattle*, 347 F.3d 809, 815 (9th Cir. 2003) (concluding that the Government retains the authority to "legitimately exclude speech based on subject matter where the subject matter is outside the designated scope of the forum," but "if the speech does fall within an acceptable subject matter otherwise included in the forum, the State may not legitimately exclude it from the forum based on the viewpoint of the speaker"); *Bannon*, 387 F.3d at 1215–16 (where the school "refus[ed] to allow [the appellant], or anyone else, to make explicitly religious statements in murals . . . it restricted speech on the basis of content, not viewpoint"); *Campbell v. St. Tammany Par. Sch. Bd.*, 300 F.3d 526, 529 (5th Cir. 2002) (Gibson, J., concurring) (where the ability to engage in "religious services" was "a subject matter for which the school district had not made its property available," the "case differs importantly from [*Good News Club*, *Rosenberger*, and *Lamb's Chapel*]"); *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207, 213 (2d Cir. 1997) (*Rosenberger* "reiterated the distinction to be made between discrimination against speech because of its subject matter, considered permissible to preserve the purposes of the limited forum, and viewpoint discrimination, considered impermissible if directed against speech within the limitations of the forum.").

otherwise includable subject," but rather, was rejected based on WMATA's "'exclus[ion of] religion as a subject matter,'" which "the Supreme Court has deemed permissible in a non-public forum." *Id*. at *7 (quoting *Rosenberger*, 515 U.S. at 831). To conclude otherwise and accept the appellants' argument, the D.C. Circuit found, would be "[n]ot only . . . contrary to the Supreme Court's recognition that governments retain the prerogative to exclude religion as a subject matter," but would also "undermine the forum doctrine because the [appellants] offer[] no principled reason for excepting religion from the general proposition that governments may exclude subjects in their non-public forums." *Id*. at *6.

The same analysis requires an analogous result here. USPS's regulations require the categorical exclusion of political content from Customized Postage and thus are viewpoint neutral. Indeed, USPS's purpose in doing so was specifically to *avoid* any possibility of discrimination on the basis of viewpoint. *See* 82 Fed. Reg. at 60,117 (noting that the final rule "[e]xclud[es] entire categories of content altogether to help avoid unlawful viewpoint discrimination"); *see also Archdiocese of Wash*., 2018 WL 3625417, at *5 (noting that the nonpublic forum doctrine "preserves the government's ability to manage potentially sensitive non-public forums while cabining its discretion to censor messages it finds more or less objectionable"). Plaintiffs do not, as the parties did in *Good News Club*, *Rosenberger*, and *Lamb's Chapel*, seek to engage in "speech discussing otherwise permissible subjects" within the forum. *Good News Club*, 533 U.S. at 112. To the contrary, the only speech permissible for use on Customized Postage is "commercial or social [content] that is suitable for all-ages audiences," which is defined to exclude political content altogether. 82 Fed. Reg. at 60,118. The Supreme Court's

40

decisions in *Good News Club*, *Rosenberger*, and *Lamb's Chapel* do not bar USPS from doing so.

## CONCLUSION

For the foregoing reasons, USPS respectfully requests that the Court dismiss the claims originally set forth in Plaintiffs' Amended Complaint, and incorporated into Plaintiffs' Supplemental Complaint, as moot under Rule 12(b)(1).  The Court should also dismiss Plaintiffs' facial First Amendment challenge in their Supplemental Complaint for failure to state a claim under Rule 12(b)(6).

Dated:  August 17, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Branch Director
Federal Programs Branch

*/s/ Jason Lee*
JASON LEE (CA Bar No. 298140)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20001
(202) 514-3367
(202) 616-8470 (fax)
Jason.Lee3@usdoj.gov

*Counsel for Defendant*