**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANATOL ZUKERMAN, et al.**, | |
| Plaintiffs, | |
| v. | Case No. 15-cv-2131 (CRC) |
| **UNITED STATES POSTAL SERVICE**, | |
| Defendant. | |

**MEMORANDUM OPINION**

The United States Postal Service ("USPS") allows customers to design and print customized postage stamps. We've all seen them: personalized postage for a wedding invitation featuring a photograph of the happy couple, a birth announcement featuring an image of the newborn, or an upcoming sale featuring the company's logo. Artist Anatol Zukerman wanted to create his own personalized postage to promote an upcoming gallery exhibition and submitted a proposed design to a third-party vendor that printed customized postage on USPS's behalf. The vendor rejected Zukerman's design as too "partisan or political" under USPS's then-extant guidelines: aimed at critiquing the Supreme Court's <u>Citizens United</u> decision, the design cautioned that "Democracy is not for sale" and featured the image of a snake—marked with the words "Citizens United" and shaped like a dollar sign—strangling Uncle Sam. Zukerman and the gallery sued, alleging that USPS, through the vendor, had violated the First Amendment. The Court denied a previous motion to dismiss the suit for lack of jurisdiction, and the parties proceeded to discovery. In the meantime, though, USPS promulgated new regulations to govern the customized postage program, redefining and narrowing somewhat the type of content that is permitted. Again, Zukerman submitted proposed designs to a vendor; again, those designs— substantially similar to the previous one—were rejected; and again, Zukerman and the gallery

sued, supplementing their original claims with a facial First Amendment challenge to the new regulations.

USPS has moved to dismiss Plaintiffs' suit.  It says that Plaintiffs' original claims are moot because they are based on guidelines that have been superseded by the operative regulations.  And it contends that Plaintiffs' supplemental claims challenging those regulations fail to state a claim because the customized postage program is a nonpublic forum and its governing regulations need only be reasonable and viewpoint neutral, which they are.  For the reasons that follow, the Court concludes that Plaintiffs' original claims are moot and must be dismissed under Federal Rule of Civil Procedure 12(b)(1).  The Court further concludes that Plaintiffs' supplemental claims fail to state a claim and must be dismissed under Rule 12(b)(6).

## I.   Background

### A.  The Customized Postage Program

USPS launched its customized postage program in 2004 to allow customers to print at home "evidence of prepayment of postage" using their own images.  39 C.F.R. § 501.1(a).  These products are distinct from U.S. postal stamps, which are produced and controlled by USPS.  See 18 U.S.C. § 8.  Consumers may only use authorized third-party vendors to create customized postage.  Since the program's inception, it has been "the Postal Service's declared intent not to allow its Customized Postage program to become a public forum for dissemination, debate, or discussion of public issues."  Customized Postage, 71 Fed. Reg. 12,718-01, 12,719 (Mar. 13, 2006).  Rather, the program is designed to promote USPS's commercial objectives as set forth in 39 U.S.C. § 3622(b)(5), which directs the Postal Regulatory Commission "[t]o assure adequate revenues, including retained earnings, [and] to maintain financial stability."  See Request of the U.S. Postal Service to Add Postal Products to the Mail Classification Schedule,

Attachment D (Statement of Supporting Justification for Customized Postage) at 1, <u>Modification of Mail Classification Schedule Product Lists in Response to Order No. 154</u>, No. MC2009-19 (Postal Regulatory Comm'n Mar. 10, 2009) (hereinafter "USPS Statement of Support, Attachment D").

For most of the program's history, USPS restricted the permissible content of customized postage by requiring authorized vendors to abide by Standardized Image Guidelines incorporated in the vendors' authorization agreements. <u>See</u> Proposed Rule, Revisions to the Requirements for Customized Postage Products, 82 Fed. Reg. 1,294-01, 1,294 (Jan. 5, 2017). The Guidelines attached to the 2009 agreement of one such vendor, Zazzle, Inc., directed the vendor not to accept, among other categories, "[c]ontent or images actively advocating or disparaging the religious, political, or legal agenda of any person or entity, including but not limited to content or images designed to influence a specific piece of legislation" or "[p]artisan or political content or images, including but not limited to content or images supporting or opposing election of any candidate(s) to any federal/state/local governmental office or supporting or opposing any referendum conducted by federal/state/local government." Standardized Image Guidelines, Exhibit A to Customized Postage Amended and Restated Authorization between USPS and Zazzle, Inc. (May 7, 2009), ECF No. 43-7, at 9 (Filed Under Seal).[1] In interpreting and applying these Guidelines, Zazzle imposed additional restrictions, which prohibited "the printing of any

---

[1] In ruling on a motion to dismiss, the Court "properly may consider documents upon which [a] plaintiff's complaint necessarily relies" even if they are not attached to the complaint. <u>Charles v. District of Columbia</u>, 164 F. Supp. 3d 98, 100 (D.D.C. 2016) (alteration in original) (citation omitted). Plaintiffs' First Amended Complaint "necessarily relies" upon USPS's Standardized Image Guidelines, which governed the challenged program. The Court may therefore consider the Guidelines incorporated in Zazzle's authorization agreement, which was filed under seal as an attachment to Plaintiffs' motion for summary judgment.

postage with content that is primarily partisan or political in nature" or that "[a]dvocate[s] or protest[s] any social, political, legal, moral or religious agenda in a way that may appear controversial to others."  Am. Compl. ("FAC"), ECF No. 17-2, ¶¶ 15, 23.

In January 2017, USPS noticed in the Federal Register a proposed rule that would give "regulatory form" to these content restrictions and remedy any "inconsistency of publicly available provider content guidelines" that "caused confusion over Customized Postage products."  82 Fed. Reg. at 1,294.  USPS finalized the rule in December 2017.  Final Rule, Revisions to the Requirements for Customized Postage Products, 82 Fed. Reg. 60,117-01, 60,117–18 (Dec. 19, 2017).  The final rule emphasized that although customized postage is a specialized form of evidence of prepayment of postage, there is a possibility that consumers will believe that the images originated with the Postal Service.  Accordingly, USPS concluded that it "must limit eligible private content to protect its own business and brand interests against dilution, false attribution, appearances of endorsement, and other potential impacts."  Id. at 60,117.  The new Regulations thus limit the type of content allowed on customized postage to just two categories: "commercial" and "social" content.  39 C.F.R. § 501.21(b)(1).  They also require that images be suitable for all ages.  Id. § 501.21(b)(2).  Finally, the Regulations "exclud[e] entire categories of content," 82 Fed. Reg. at 60,118, including all "political, religious, violent or sexual content"; "[a]ny depiction of controlled substances"; and "[a]ny non-incidental depiction of alcohol, tobacco, gambling, or firearms," 39 C.F.R. § 501.21(b)(2).  Thus, under the Regulations, which went into effect in May 2018, the "default presumption" is that images are *in*eligible for printing.  82 Fed. Reg. at 60,118.

B.  Factual and procedural background

In July 2013, an art gallery owned by Charles Krause Reporting, LLC, displayed a drawing by Mr. Zukerman depicting Uncle Sam being strangled by a snake marked "Citizens United." FAC ¶ 17.  To promote an exhibition titled "Truth to Power: Anatol Zukerman's 'Responsible' Art," planned for February 2016, the gallery suggested that Zukerman create a custom postage design using the drawing.  Id. ¶¶ 18–19.  In early 2015, Zukerman submitted a proposed design to Zazzle, Inc., an authorized vendor under the customized postage program. Id. ¶¶ 13, 20.  Zazzle rejected the design, saying that applicable content guidelines prohibited "printing [] any postage with content that is primarily partisan or political in nature."  Id. ¶ 23 (quoting Apr. 27, 2015 Email from Zazzle Support to A. Zukerman, Exhibit M to FAC at 91).

Zukerman and the gallery sued.  Their First Amended Complaint alleges that USPS, through Zazzle, engaged in content and viewpoint discrimination in violation of the First Amendment because Zazzle printed postage promoting the campaigns of several 2016 presidential candidates while declining to produce Zukerman's proposed Citizens United design. Id. ¶¶ 24, 33, 44.  Zazzle's decision to print postage depicting specific candidates appears to violate both the Standardized Image Guidelines, which barred "[p]artisan or political content or images, including . . . content or images supporting or opposing election of any candidate(s) to any federal[] governmental office," Standardized Image Guidelines at 9, as well as Zazzle's own Appropriate Use Guidelines, which prohibited content that "incorporate[s] a . . politician . . or other famous person's name or likeness," Exhibit J to FAC at 61.

In December 2016, the Court denied USPS's motion to dismiss the First Amended Complaint for lack of jurisdiction.  See Memorandum Opinion, ECF No. 23.  The parties proceeded to discovery.  In July 2018, two weeks after Plaintiffs moved for summary judgment,

they sought leave to file a supplemental complaint setting forth a facial First Amendment challenge to the 2018 Regulations.  See Motion for Leave to File Suppl. Compl., ECF No. 48. The Court granted this request.  See July 18, 2018 Minute Order.

Plaintiffs' Supplemental Complaint alleges that the Regulations violate the First Amendment by barring "political" designs.  Plaintiffs aver that they placed two orders for customized postage with Stamps.com, another authorized vendor.[2]  The orders were for a "substantively identical" design to that previously submitted to Zazzle in April 2015.  Suppl. Compl., ECF No. 52, ¶¶ 5, 6, 8.  But in addition to the image of the dollar-sign snake strangling Uncle Sam, the design features the text "Democracy is Not for Sale, But This Artwork Is!"— presumably included to situate the design within USPS's allowance for commercial content— and the name "Charles Krause Reporting Fine Art."  Id. ¶ 6.  Both orders were rejected because they "did not meet the 'content guidelines.'"  Id. ¶¶ 7, 9.

USPS has moved to dismiss Plaintiffs' claims originally set forth in the First Amended Complaint, which challenge the prior Guidelines, and the claims set forth in the Supplemental Complaint, which target the 2018 Regulations.  See Mem. Supp. Mot. Dismiss ("MTD"), ECF No. 55-1.[3]  The government argues that the original claims are moot because the Regulations replaced the Guidelines and that the supplemental claims fail to state a facial First Amendment

---

[2] Zazzle is no longer an authorized vendor.  Suppl. Compl., ECF No. 52, ¶ 4.

[3] Technically, USPS seeks to dismiss all of the claims in Plaintiffs' Supplemental Complaint, which "incorporate[s] by reference every allegation in the First Amended Complaint."  Suppl. Compl. ¶ 1.  For ease of reference, the Court refers to the claims set forth in the First Amended Complaint as Plaintiffs' "original claims" and the claims first set forth in the Supplemental Complaint as Plaintiffs' "supplemental claims."

challenge to the operative Regulations.  Plaintiffs oppose the motion.  See Opp'n, ECF No. 56.
The Court heard oral argument on April 10, 2019.

## II.   Standard of Review

When evaluating a motion to dismiss, the Court must "treat the complaint's factual
allegations as true and must grant [the] plaintiff 'the benefit of all inferences that can be derived
from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir.
2000) (citations omitted); Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011)
(citation omitted).  The Court need not accept the plaintiff's legal conclusions, however.
Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).  USPS has moved to dismiss the
complaint for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for
failure to state a claim under Rule 12(b)(6).

"A motion to dismiss for mootness is properly brought under Rule 12(b)(1) because
mootness itself deprives the court of jurisdiction."  Indian River Cty. v. Rogoff, 254 F. Supp. 3d
15, 18 (D.D.C. 2017).  Unlike some jurisdictional questions such as standing or ripeness, the
party asserting mootness—here, USPS—bears the "initial 'heavy burden'" of establishing that
the case is moot.  Honeywell Int'l, Inc. v. NRC, 628 F.3d 568, 576 (D.C. Cir. 2010) (citation
omitted).  This burden remains when the defendant contends that its voluntary action deprives
the court of jurisdiction.  PETA v. U.S. Dep't of Agric., 918 F.3d 151, 157 (D.C. Cir. 2019)
(quoting Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc., 538 U.S. 167, 189 (2000)).

To survive a 12(b)(6) motion, it is the plaintiff who bears the (relatively light) burden of
showing that the complaint contains sufficient facts which, if accepted as true, state a plausible
claim for relief.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 570 (2007)).

## III.  Analysis

There are two central issues before the Court.  First, whether it has jurisdiction to consider Plaintiffs' claims based on the Standardized Image Guidelines or whether the superseding Regulations render the original claims moot.  And second, whether Plaintiffs' Supplemental Complaint states a plausible First Amendment challenge to the 2018 Regulations. For the reasons that follow, the Court concludes that Plaintiffs' challenges to the Guidelines are moot and will therefore dismiss the claims originally set forth in Plaintiffs' First Amended Complaint for lack of jurisdiction.  And even if it did have jurisdiction over those claims, both precedent and practicality counsel against passing on the constitutionality of a superseded enforcement regime.  The Court further concludes that Plaintiffs have failed to state a facial First Amendment challenge to the Regulations because the customized postage program is a nonpublic forum and the Regulations are both reasonable and viewpoint neutral.  The Court will, therefore, also dismiss the claims first advanced in the Supplemental Complaint.

### A.  Challenge to the Guidelines

#### 1.  Mootness

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."  Conservation Force, Inc. v. Jewell, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting Iron Arrow Honor Soc'y v. Heckler, 464 U.S. 67, 70 (1983)).  "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"  Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (quoting Murphy v. Hunt, 455 U.S. 478, 481 (1982) (per curiam)).

When "intervening events make it impossible to grant the prevailing party effective relief," no live controversy remains.  Lemon v. Green, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (citation omitted).  As relevant here, "when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot."  Akiachak Native Cmty. v. U.S. Dep't of Interior, 827 F.3d 100, 113 (D.C. Cir. 2016) (listing cases); see also Initiative & Referendum Inst. v. USPS ("IRI"), 685 F.3d 1066, 1074 (D.C. Cir. 2012) ("A challenge to a superseded law is rendered moot unless there [is] evidence indicating that the challenged law likely will be reenacted." (alteration in original) (internal quotation marks, citation omitted)); CREW v. Wheeler, 352 F. Supp. 3d 1, 11 (D.D.C. 2019) ("The promulgation of a superseding policy or program can have the power to moot a challenge to the old one.").  The D.C. Circuit has advised that in "such cases, [] if the agency promulgates a new regulation contrary to one party's legal position, that party may 'cure[] its mootness problem by simply starting over again' by challenging the regulations currently in force."  Akiachak Native Cmty., 827 F.3d at 113 (second alteration in original) (citations omitted).

USPS argues that is precisely what happened here: issuance of the new Regulations is an intervening event that moots any claim based upon Guidelines no longer in force.  Because the customized postage program is now governed by the 2018 Regulations, and Plaintiffs supplemented their complaint to challenge the constitutionality of those regulations, USPS says the Court should dismiss as moot any claims based on the Guidelines.  The Court agrees: it is "a perfectly uncontroversial and well-settled principle of law" that rescinding and replacing a challenged regulation moots litigation over the original regulation.  Id. at 113.  USPS has rescinded and replaced the Guidelines with the Regulations, so any challenge to the constitutionality of the Guidelines is now moot.

Plaintiffs actually also agree—to a degree.  They "concede that *some* of the relief [originally] sought . . . is now moot in light of the new USPS regulations": the Court cannot declare that the Guidelines are unconstitutional and cannot enjoin USPS from enforcing Guidelines no longer in effect.  Opp'n at 11.  Even so, Plaintiffs contend that USPS's adoption of the 2018 Regulations does not moot their original claims because they "continue to suffer redressable harm."  Id.  In advancing this argument, Plaintiffs invoke the voluntary-cessation exception to the mootness doctrine.

### 2.   *Voluntary-cessation exception*

Under the voluntary-cessation exception to mootness, when "the intervening event is of the defendant's own doing," the Court "examine[s] whether the defendant's voluntary cessation of the challenged action truly renders the case moot."  Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth. ("AFDI"), 901 F.3d 356, 362 (D.C. Cir. 2018), pet. for cert. filed, No. 18-1000 (U.S. Jan. 31, 2019) (quoting IRI, 685 F.3d at 1074).  This occurs when "(1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation."  Id. (quoting Nat'l Black Police Ass'n v. District of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997)).  Plaintiffs argue that their original claims "remain alive" under this exception because the alleged violation and their attendant injuries are "ongoing" insofar as "'political' designs that Zazzle printed for others on customized postage products are in circulation today even as Plaintiffs remain silenced."  Opp'n at 10–11.  But any such residual effect of the prior Guidelines is not grounds for applying the voluntary-cessation exception here.

Starting with the first requirement of the exception, Plaintiffs argue that the Regulations and Guidelines are "similar in key respects" such that the alleged speech violations—the printing

of postage touting several 2016 presidential campaigns but not Mr. Zukerman's design—are

reasonably likely to recur.  Opp'n at 13.  As this argument suggests, whether an alleged violation

is reasonably likely to recur depends in part on whether the previous regulatory regime and the

one that replaced it are "fundamentally similar."  AFDI, 901 F.3d at 362.  Plaintiffs lean heavily

on the D.C. Circuit's recent opinion in AFDI.  See Opp'n at 12.  In that case, an advocacy

organization challenged a temporary moratorium on issue-oriented advertising in Washington,

D.C.'s regional public transportation system.  AFDI, 901 F.3d at 360.  After the suit was filed,

the transit authority, WMATA, rescinded the moratorium and adopted new guidelines in its

place.  Id. at 361.  Although the plaintiff did not amend its complaint to challenge the new

guidelines, id., the D.C. Circuit concluded that its claims were not moot because the guidelines

and the moratorium they replaced were "fundamentally similar," id. at 362.  WMATA had

simply "renewed the challenged conduct in a new form."  Id.

     Not so here.  Although the Regulations and the Guidelines are not as starkly different as

the government would have the Court believe, the Court can discern key distinctions between the

two regimes.  The Regulations' prohibition of everything but commercial and social content is

logically more restrictive than the Guidelines' exclusion of content that "actively advocat[es] or

disparag[es] the [] political [] agenda of any person or entity" or "[p]artisan or political content"

that "support[s] or oppos[es] election of any candidate" or "referendum."  Standardized Image

Guidelines at 9.  In other words, under the current program, *no* political content is permitted,

regardless of whether that content is neutral or takes a stance on a particular issue; under the

prior program, at least some political content would have been permitted provided it was non-

partisan and did not advance a particular "agenda."  Hypothetically, the Court can envision

certain calls for political or civic participation—e.g., "Register to Vote" or "Think Global, Act

Local"—that would not be permitted under the Regulations because they are neither commercial nor social, but could have been under the Guidelines because they are both general and non-partisan.

The daylight between the two programs is in part a product of their default presumptions. The Regulations start from a "default presumption" of "ineligibility" and then carve out two narrow categories of permissible content: "commercial" and "social."  82 Fed. Reg. at 60,118; see also 39 C.F.R. § 501.21(b)(1).  All other content, including "political" content (no matter how incidental or neutral), is categorically excluded.  39 C.F.R. § 501.21(b)(2).  The Guidelines, by contrast, started from a presumption of eligibility and then enumerated categories of prohibited content.

Relatedly, the Regulations represent a more objective, blanket ban while the Guidelines allowed for considerable subjective line-drawing.  The Regulations simply ban all political content without exception; the Guidelines, by contrast, appear to have allowed for *some* political content so long as it was neutral.  In addition, the Regulations do not allow vendors to impose additional eligibility criteria, while vendors under the Guidelines could, as demonstrated by Zazzle's interpretive gloss barring "primarily partisan or political" designs or designs advocating for or against a political agenda "in a way that may appear controversial to others."  FAC ¶¶ 15, 23.  Figuring out whether a particular design is primarily partisan, would be controversial to others, or advocates for or against specific legislation demands a level of subjectivity not required by the Regulations.  Therefore, the Court concludes that although there is some overlap between the Regulations and the Guidelines, USPS did not simply "repeal[] the challenged [program] and replac[e] it with one that differs only in some insignificant respect."  AFDI, 901

F.3d at 362 (quoting Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 662 (1993)).  The differences are meaningful.

Courts have also found that an alleged violation is reasonably likely to occur where there is "evidence indicating that the challenged law likely will be reenacted."  Nat'l Black Police Ass'n, 108 F.3d at 349.  There is no such evidence here.  To the contrary, USPS undertook notice-and-comment rulemaking to supersede the Guidelines, making it highly unlikely that it will reverse course and reinstate them.  Accord IRI, 685 F.3d at 1074 (finding it "implausible that the Postal Service would have gone through the cumbersome process of amending its regulation . . . only to re-amend the regulation after this case is resolved").  The Court concludes, therefore, that there is no reasonable expectation that the alleged conduct will recur.[4]

Moving to the second requirement of the voluntary-cessation exception, Plaintiffs argue that they continue to suffer redressable harm as a result of the Standardized Image Guidelines because some previously approved politically themed postage remain in circulation.  They say that unlike in the cases cited by USPS, which "merely challeng[ed] the legality of a since-repealed rule," Plaintiffs continue to "seek[] tangible relief" based on their original claims.

---

[4] The parties engaged in discovery prior to the issuance of the 2018 Regulations. However, because the Court is ruling on USPS's motion to dismiss, it cannot consider evidence adduced during discovery concerning Zazzle's alleged printing of the postage, highlighted in Plaintiffs' First Amendment Complaint, advocating the campaigns of several of the 2016 presidential candidates.  The Court notes, however, that acceptance of those designs squarely violated not only the Postal Service's prior Guidelines (which prohibited "images supporting the election . . . of any candidate"), but also Zazzle's own internal standards (which prohibited use of any politician's "name or likeness").  And it appears undisputed that the Postal Service terminated Zazzle as an authorized vendor—indeed, Plaintiffs submitted their revised designs to a different vendor, Stamps.com.  Without an evidentiary record upon which it can rely, the Court cannot assess what role—if any—USPS may have played in authorizing the designs.  But all indications from the pleadings are that they resulted from a misapplication of the standards by a vendor that no longer participates in the program.  This only bolsters the Court's conclusion that the alleged violations are unlikely to recur.

Opp'n at 17.  Plaintiffs assert that the Court "can provide relief for the injuries [they] sustained from USPS's pre-May 2018 customized postage stamp program" by doing one of two things to, in essence, level the speech playing field: order USPS "[1] to print Plaintiffs' desired postage or [2] to decertify improperly printed political postage."  Id. at 11.

With respect to Plaintiffs' first proposed form of relief, as USPS points out, "any restriction on [Plaintiffs'] speech at this time is a consequence of [USPS's] new [] policy, not a relic of its old one."  Reply, ECF No. 57, at 9 (alterations in original) (quoting Am. Freedom Def. Initiative v. Metro. Trans. Auth., 815 F.3d 105, 110 (2d Cir. 2016)).  Thus, "[b]ecause th[e] [Guidelines] no longer exist[], [the Court] can do nothing to affect [Plaintiffs'] rights relative to [them]."  Akiachak Native Cmty., 827 F.3d at 106.  In addition, here, Plaintiffs have alleged that they twice submitted designs that were then denied under the 2018 Regulations.  *Those* denials are the source of Plaintiffs' present injury and the reason they do not have postage in circulation. Accord Clean Water Action v. Pruitt, 315 F. Supp. 3d 72, 89 (D.D.C. 2018) ("To the extent that the plaintiffs suffer any harm from the modified compliance deadlines going forward, the harmful effects will stem from the ELG Rule Amendment, not the withdrawn Stay.").

Plaintiffs' second proposed form of relief doesn't save the day—or their claims—either. They ask the Court to require USPS to decertify or recall what they allege is improperly approved political postage.  Opp'n at 16.  According to Plaintiffs, their injury persists because "USPS has *not* yet closed the forum [that existed under the Guidelines] because customized postage products bearing political expression remain in circulation."  Id. at 15–16.  Until USPS decertifies or recalls these postage products, Plaintiffs say, their injury will be ongoing.  Id. There are numerous problems with this argument.

At the outset, Plaintiffs did not include decertification or recall as requested remedies in their complaints. "[T]he scope of a federal court's jurisdiction to resolve a case or controversy is defined by the affirmative claims to relief sought in the complaint[.]" Akiachak Native Cmty., 827 F.3d at 106. Therefore, "to determine whether [a] case ha[s] become moot," a court "look[s] only to the 'relief requested by'" the plaintiff. Id. (quoting Nat'l Football League Players Ass'n v. Pro Football, Inc., 56 F.3d 1525, 1529 (D.C. Cir. 1995), vacated in part on other grounds, 79 F.3d 1215 (D.C. Cir. 1996)); see also Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc., 404 U.S. 412, 414–15 (1972) (finding challenge to repealed statute providing tax exemption for church property moot where no court could grant "[t]he *only relief* sought in the complaint" (emphasis added)); Love v. Griffith, 266 U.S. 32, 34 (1924) (finding challenge to rule prohibiting African Americans from voting in past primary election moot because "bill was for an injunction that could not be granted at that time" and "[t]here was no constitutional obligation to extend the remedy beyond what was prayed"). Plaintiffs' failure to request decertification or recall in their complaints is grounds to reject this aspect of their response to USPS's mootness argument.

But even if Plaintiffs had requested this form of relief, the fact that there remain vestiges of the previous enforcement regime does not mean that USPS has failed to close the previous forum or, relatedly, that Plaintiffs' injury is ongoing. The Court has been unable to find, and Plaintiffs have not provided, any case law suggesting that the government must eradicate all private speech in order to effectively close a particular forum. As Plaintiffs recognize, and as discussed more fully below, the government unquestionably has the power to convert a designated public forum (assuming *arguendo* that the customized postage program under the Guidelines was one) into a nonpublic forum. Opp'n at 16 (citing Archdiocese of Wash. v. Wash.

Metro. Area Transit Auth., 897 F.3d 314, 323 (D.C. Cir. 2018)).  But what Plaintiffs miss is that

the thrust of the forum inquiry turns on the government's *intent*, not its total effectiveness in

enforcing a policy.  See Ridley v. Mass. Bay Trans. Auth., 390 F.3d 65, 78 (1st Cir. 2004) ("One

or more instances of erratic enforcement of a policy does not itself defeat the government's

intent not to create a public forum.").  For example, as counsel for USPS highlighted at the

hearing, in Hodge v. Talkin, 799 F.3d 1145 (D.C. Cir. 2015), the D.C. Circuit found it "of no

moment" that the Supreme Court police had, "in certain situations," declined to enforce an

assembly and display prohibition on the Supreme Court plaza.  Id. at 1162.  The plaintiff in that

case complained that while he was arrested after displaying a political sign on the plaza, scores

of others were not arrested even though they gathered on the Supreme Court steps to engage in a

particularly fervent protest.  Id.  According to the D.C. Circuit, "[t]he fact that the protesters

made their way onto the plaza for a quarter of an hour did not somehow transform the plaza into

a public forum for all time.  Rather, the plaza was then, and remains now, a nonpublic forum."

Id.  Likewise here.  Because the focus is on the government's intent rather than its effectiveness,

and without any case law to the contrary, the Court declines to find that USPS is required to

completely eradicate every trace of private speech when closing a forum.

      Moreover, Plaintiffs' request for decertification or recall strikes the Court as inconsistent

with basic First Amendment principles.  "The preferred First Amendment remedy" is one of

"more speech, not enforced silence."  Brown v. Hartlage, 456 U.S. 45, 61 (1982) (quoting

Whitney v. California, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).  Plaintiffs'

request—to silence others because Plaintiffs claim they were unfairly silenced—is antithetical to this bedrock value.[5]

### 3. Prudential considerations

Even if Plaintiffs' original claims were justiciable, practical considerations would lead the Court to assess the constitutionality of the current Regulations only. The D.C. Circuit has counseled that "precedent and practicality direct us to deal with the world as it is now, not as it was when the case was filed." AFDI, 901 F.3d at 363. For this reason, "the Supreme Court routinely considers agency regulations that [] superseded the originally challenged regulation during the course of the litigation." Id. (citing Cal. Bankers Ass'n v. Shultz, 416 U.S. 21, 53 (1974); Thorpe v. Hous. Auth. of Durham, 393 U.S. 268, 281–82 (1969)). Following this practice, the AFDI court concluded that even though the plaintiff's challenge to WMATA's temporary moratorium was not moot for the reasons discussed above, it would only pass on the constitutionality of the operative guidelines that had replaced the moratorium. Id. The same reasoning applies here. The Court "see[s] no advantage to either of the parties in [] ruling upon a policy that has no continuing bite." Id. The Court will therefore turn next to whether Plaintiffs have plausibly alleged that the 2018 Regulations governing the customized postage program violate the Free Speech Clause of the First Amendment.

### B. Facial challenge to the 2018 Regulations

Courts use a "forum based approach" to assess private-speech restrictions on government property. Minn. Voters All. v. Mansky, 138 S. Ct. 1876, 1885 (2018) (quoting Int'l Soc. for

---

[5] The government also contends that it would be practically impossible for USPS to decertify or recall previously issued custom postage. But that is a factual issue beyond the pleadings, which the Court need not reach given the deficiencies in Plaintiffs' position noted above.

Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992)).  Under the forum doctrine, the

Court first determines the type of forum at issue, which in turn dictates the level of scrutiny that

applies to the challenged restriction.  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460

U.S. 37, 44 (1983) ("The existence of a right of access to public property and the standard by

which limitations upon such a right must be evaluated differ depending on the character of the

property at issue.").  There are "three types of fora: the traditional public forum, the public forum

created by government designation, and the nonpublic forum."  Cornelius v. NAACP Legal Def.

& Educ. Fund, Inc., 473 U.S. 788, 802 (1985).  Traditional public fora—like sidewalks and

parks—are not implicated here.  Designated public fora are those places which the government

has "opened for use by the public as a place for expressive activity."  Perry, 460 U.S. at 45.

Nonpublic fora are those places which are "not by tradition or designation a public forum" and

are not "held open to the public for general debate."[6]  Archdiocese, 897 F.3d at 322 (citing Perry,

460 U.S. at 46).  In this last kind of forum, the government limits use to certain groups and/or

discussion to certain subjects.  Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 470 (2009).

   While restrictions on both kinds of public fora are subject to strict scrutiny, restrictions

on nonpublic fora are subject to a deferential review: "The government may reserve such a

forum 'for its intended purposes, communicative or otherwise, as long as the regulation on

---

   [6] "Some circuits recognize four forums rather than three: public forums, designated
public forums (analyzed as public forums), limited public forums (analyzed the same way as
non-public forums), and non-public forums."  Pulphus v. Ayers, 249 F. Supp. 3d 238, 246 n.2
(D.D.C. 2017) (citing Hopper v. City of Pasco, 241 F.3d 1067, 1074 (9th Cir. 2001)).  Although
"[t]he Supreme Court has been imprecise with its language in the past, [it] seems to use the term
non-public forum and limited public forum interchangeably."  Id.  Whether these terms refer to
the same kind of fora or to separate kinds, both are subject to the same deferential standard of
review.  Id.

speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" Mansky, 138 S. Ct. at 1885 (quoting Perry, 460 U.S. at 46).

### 1. *Type of forum*

The first question for the Court, then, is whether the customized postage program qualifies as a designated public forum or a nonpublic forum. As explained above, "[t]he 'touchstone' for determining whether the Government has designated a forum public is its 'intent in establishing and maintaining' that forum." Bryant v. Gates, 532 F.3d 888, 895 (D.C. Cir. 2008) (quoting Stewart v. D.C. Armory Bd., 863 F.2d 1013, 1016 (D.C. Cir. 1988)). The Supreme Court has long held that the "government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802 (citing Perry, 460 U.S. at 46). "To ascertain the Government's intent," the Court looks "not only at the Government's 'stated purpose' but also at 'objective indicia of intent,' such as 'the nature of the property, its compatibility with expressive activity, and the consistent policy and practice of the government.'" Bryant, 532 F.3d at 896 (emphasis omitted) (quoting Stewart, 863 F.2d at 1016–17).

Starting with the stated purpose. Since the customized postage program's inception as a pilot program, it has been "the Postal Service's declared intent not to allow its Customized Postage program to become a public forum for dissemination, debate, or discussion of public issues." 71 Fed. Reg. at 12,719. The 2017 final rule hews to this stated intent. For example, commenters asked USPS to create a category of permissible content for nonprofits in addition to the social and commercial categories. USPS rejected this request to avoid any "impermissible viewpoint discrimination, which would endanger the entire program." 82 Fed. Reg. at 60,117. Referencing its limits on eligible private content, USPS explained that the "First Amendment

requires that such content- or speaker-based restrictions be reasonable and viewpoint-neutral."
Id. (citing Matal v. Tam, 137 S. Ct. 1744, 1763 (2017)).  As explained above, this is the standard
of review for *non*public fora.  And as USPS points out, the cited portion of Matal concerns
"cases in which a unit of government creates a limited public forum"—again, which is "analyzed
the same way" as nonpublic fora[7]—"for private speech."  137 S. Ct. at 1763 (citing Good
News Club v. Milford Cent. Sch., 533 U.S. 98, 106–07 (2001); Rosenberger v. Rector & Visitors
of Univ. of Va., 515 U.S. 819, 831 (1995); Lamb's Chapel, 508 U.S. at 392–93, all cases in
which the Supreme Court concluded that the forum in question was not subject to strict scrutiny
as a traditional or designated public forum).  By referencing the legal standard applicable to
nonpublic fora and citing case law applying that standard, USPS clearly evinced an intent to
create a nonpublic forum in the 2017 final rule.

In addition, the rule notes that "[e]xcluding entire categories of content altogether to help
avoid unlawful viewpoint discrimination is an eminently reasonable limitation made in
accordance with First Amendment principles."  82 Fed. Reg. at 60,117.  The use of "reasonable"
similarly conveys an intent to create a nonpublic rather than public forum.  Content-based
restrictions are permissible in nonpublic fora so long as they are "reasonable" and do not
discriminate on the basis of viewpoint.  Mansky, 138 S. Ct. at 1885–86.  Content-based
restrictions in public fora, by contrast, are subject to strict scrutiny and are not permissible unless
narrowly drawn to a compelling interest.  Perry, 460 U.S. at 46.

Other objective indicia likewise demonstrate that USPS intended the customized postage
program to be a nonpublic forum.  The Supreme Court has explained it will not "infer that the

---

[7] Pulphus, 249 F. Supp. 3d at 246 n.2.

government intended to create a public forum when the nature of the property is inconsistent

with expressive activity." Cornelius, 473 U.S. at 803.  This inquiry, like the last, takes into

account the government's purpose in establishing the forum in the first place.  As relevant here,

courts have concluded that a government's use of its property "as a commercial enterprise [is]

inconsistent with an intent to designate the [property] as a public forum." Id. at 804 (describing

Lehman v. City of Shaker Heights, 418 U.S. 298, 299–300 (1974)); see also Ridley, 390 F.3d at

79 (distinguishing policies intended to "generate revenue" from those intended to "facilitate

expression").  This is because when the government is engaged in a commercial enterprise, it can

consider and limit the type of content that could jeopardize revenue or alienate potential

customers.  See, e.g., Ridley, 390 F.3d at 95; Uptown Pawn & Jewelry, Inc. v. City of

Hollywood, 337 F.3d 1275, 1279 (11th Cir. 2003) ("[T]he City is doing what this circuit has

authorized in a nonpublic forum: making distinctions based upon content in order to preserve the

bus benches for the intended use of generating revenue").  USPS launched the customized

postage program in order to generate revenue by receiving both the face value of the postage as

well as annual authorization fees from third-party stamp vendors.  USPS Statement of Support,

Attachment D at 1 (citing 39 U.S.C. § 3622(b)(5)).  Plaintiffs' conclusory assertion that

"[c]ustomized postage is, by nature, fully compatible with creative expression," Opp'n at 20, is

no response to the case law permitting a government agency engaged in a commercial enterprise

to reasonably restrict content that would jeopardize that enterprise.  Accordingly, this factor too

weighs in favor of concluding that USPS did not intend to create a designated public forum.

   The next objective indicator of government intent is "the consistent policy and practice of

the government." Bryant, 532 F.3d at 896 (emphasis omitted).  This factor also cuts against

finding an intent to create a public forum.  The 2018 Regulations restrict the customized stamp

program to just two categories of permissible content: commercial and social content that is

suitable for all ages.  82 Fed. Reg. at 60,118.  And they establish a "default presumption" of

"ineligibility" for all other content, including the non-exhaustive list provided: political,

religious, violent or sexual content; non-incidental depictions of firearms and alcohol; and

depictions of controlled substances.  Id.; see also 39 C.F.R. § 501.21(b)(2).  In other words, the

customized postage program permits only extremely "selective access," which supports the

conclusion that USPS did not intend to create a public forum.  Cornelius, 473 U.S. at 805; see

also Hopper, 241 F.3d 1078 ("In general, the more restrictive the criteria for admission and the

more administrative control over access, the less likely a forum will be deemed public.").

Other courts evaluating intent have also considered whether the government has

strengthened over time the limitations on participation in a particular regulatory scheme.  For

example, in Ridley, the First Circuit reasoned that in light of "the litany of limitations on

advertisements from the inception of its program, and *the strengthening of those limitations in*

*2003*, the [public transit authority] has, at least by 2003, through its policy expressed an

intent *not* to open its advertising space to all persons and organizations for public dissemination

of their views on all topics without limitation."  390 F.3d at 78 (first emphasis added).  So, too,

here.  As discussed previously, USPS has *strengthened* these limitations on eligible content by

more sharply proscribing what can be printed and eliminating much of the subjective line-

drawing that characterized the Guidelines.  Even assuming that the enforcement regime in

existence before the Regulations constituted a designated public forum—an issue the Court need

not decide—"the government 'is not required to indefinitely retain the open character of the

facility.'"  Cornelius, 473 U.S. at 802 (quoting Perry, 460 U.S. at 46); see also Archdiocese, 897

F.3d at 323 (A government "may instead choose to convert a designated public forum back into a

non-public forum because 'the government retains the choice' regarding the status of its forum."
(quoting <u>Ark. Educ. Television Comm'n v. Forbes</u>, 523 U.S. 666, 680 (1998))).  Therefore,
USPS was well entitled to tighten its control over the customized postage program and transition
the program from a public to a nonpublic forum.

Plaintiffs counter that this final objective indicator turns on whether the government
"*consistently* enforces the restrictions on the use of the forum that it adopted."  Opp'n at 20
(emphasis added) (quoting <u>Hopper</u>, 241 F.3d at 1075).  They return to the lingering effects of the
previous regime in arguing that because "USPS continues to allow [circulation of] 'political'
customized postage designs that were approved when the forum was public," the current forum
remains public.  <u>Id.</u> at 21.  Yet Plaintiffs fail to cite any case law for the proposition that courts
should consider rescinded versions of a program in assessing the consistency of a government's
enforcement of a current version under challenge.  In fact, the cases suggest that the inquiry is
limited to the existing program.  <u>See Hopper</u>, 241 F.3d at 1070–74 (focusing on the consistency
of the government's practice going forward after adopting the program at issue, not looking to a
prior version); <u>Am. Freedom Def. Initiative v. WMATA</u>, 245 F. Supp. 3d 205, 213 (D.D.C.
2017), <u>aff'd in part, rev'd in part</u>, <u>AFDI</u>, 901 F.3d 356 (D.C. Cir. 2018) ("[H]aving established
that WMATA was permitted to change its guidelines, the relevant inquiry is not whether
WMATA allowed other controversial messages before the May 28 Moratorium, but whether
WMATA has consistently enforced the new guidelines since they were enacted.").  As Plaintiffs
have not claimed that the Postal Service has inconsistently enforced the 2018 Regulations, this
factor too supports a finding that USPS intended to create a nonpublic forum.[8]

_____

[8] In any event, as explained above, "[o]ne or more instances of erratic enforcement of a
policy does not itself defeat the government's intent not to create a public forum."  <u>Ridley</u>, 390

Based on USPS's stated purpose in establishing the pilot program, its reliance on nonpublic-forum case law in the final rule, its use of the customized postage program as a commercial enterprise, and its strengthening of the restrictions over time, the Court concludes that, regardless of how one might characterize the prior Guidelines, the customized postage program under the 2018 Regulations qualifies as a nonpublic forum.

2. *Reasonableness*

Plaintiffs argue that even if the customized postage program is a nonpublic forum, the Regulations are still unconstitutional because they are unreasonable.

A reminder: under the Supreme Court's forum doctrine, the government may restrict access to a nonpublic forum "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" Archdiocese, 897 F.3d at 318 (alteration in original) (quoting Cornelius, 473 U.S. at 800).  Plaintiffs do not argue that the Regulations discriminate on the basis of viewpoint.[9]  The only question, then, is whether they are reasonable.  "The reasonability inquiry is not a demanding one, but rather is a 'forgiving test.'"  Id. at 329–30 (quoting Mansky, 138 S. Ct. at 1888).  The challenged restriction need not "be the most reasonable or the only reasonable limitation" so long as it is *a* reasonable one.  Id. at 330 (quoting Hodge, 799 F.3d at 1165).

_____

F.3d at 78; see also Hodge, 799 F.3d at 1162 (concluding that Supreme Court plaza was not converted into designated public forum based on inconsistent enforcement of prohibition on assembly and display).  Even if the Court were to consider the lingering effects of the superseded Guidelines, the few instances of political postage issued under them would not undermine the strong evidence of USPS's intent to treat the program as a nonpublic forum going forward.

[9] The D.C. Circuit recently emphasized that categorical subject-matter restrictions are not viewpoint-based restrictions.  Id. at 319.  Therefore, that the Regulations exclude entire categories, like political or religious speech, does not constitute viewpoint discrimination.

Plaintiffs advance two reasons why the Regulations fail even this forgiving test.  First, the wholesale exclusion of "political" content is too indeterminate to be reasonable under the Supreme Court's recent decision in <u>Minnesota Voters Alliance v. Mansky</u>, 138 S. Ct. 1876 (2018).  And second, the political-speech ban does not reasonably serve the purposes of the customized postage program.

a.  <u>Mansky</u>

First, <u>Mansky</u>.  The question there was whether Minnesota's "political apparel ban" barring voters from wearing political badges and other insignia inside a polling place on election day violated the Free Speech Clause.  <u>Id.</u> at 1882–83.  Polling places, as "government-controlled property set aside for the sole purpose of voting," are nonpublic fora; therefore, the political-apparel ban had to be both reasonable and viewpoint neutral.  <u>Id.</u> at 1886.  And, as here, because "the apparel ban ma[de] no distinction based on the speaker's political persuasion," the only question was whether the ban was "'reasonable in light of the purpose served by the forum': voting."  <u>Id.</u> (quoting <u>Cornelius</u>, 473 U.S. at 806).  The Supreme Court concluded that while Minnesota's purpose in adopting the ban was permissible, <u>id.</u> at 1887, its methods were not. "Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out."  <u>Id.</u> at 1888.  And on that ground, the law did not survive the "forgiving" reasonableness test because of "the unmoored use of the term 'political' in the Minnesota law, combined with the haphazard interpretations the State has provided in official guidance and representations to this Court."  <u>Id.</u>

The D.C. Circuit recently interpreted <u>Mansky</u>'s reasoning as follows.  First, "a challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently

25

enforced." Archdiocese, 897 F.3d at 330 (citing Mansky, 138 S. Ct. at 1888–90).  But beyond the postage designs Plaintiffs say were improperly approved under the previous Guidelines— already addressed above—Plaintiffs do not allege that the Regulations are inconsistently enforced today.

And second, "a restriction may also be unreasonable if it is unclear what speech would be swept in or otherwise seriously hamper consistent administration." Id. (citing Mansky, 138 S. Ct. at 1888–90).  In Mansky, the Supreme Court faulted Minnesota for not defining the "expansive" term "political," 138 S. Ct. at 1888, and for failing to give election judges "objective, workable standards" to determine what was political and thus barred under the apparel ban, id. at 1891.  Plaintiffs say that has happened here too because "the USPS regulations do not offer any determinate meaning for the word 'political' or otherwise provide discernable boundaries for the class of content it excludes." Opp'n at 22.[10]  But while the term "political" may not be defined by the regulations, both "commercial" and "social" are.  Under the Regulations, "[c]ommercial means intended for no purpose other than the sale of goods or services in commerce." 39 C.F.R. § 501.21(b)(1)(i).  "Social means promoting or depicting people, animals, items, or events commonly associated with community relations or companionship and likely to generate invitations, announcements, notices, thank-you notes, RSVPs, or similar correspondence." Id. § 501.21(b)(1)(ii).  Only then are these two categories of permissible content narrowed further by what they cannot be, including "political, religious, violent or sexual." Id. § 501.21(b)(2)(iii).  In other words, Plaintiffs rely on a false equivalence

---

[10] Contrary to USPS's framing, the Court does not take Plaintiffs' argument to be that under Mansky, all "'bans on "political speech" in nonpublic forums' are per se 'unreasonable[.]'" Reply at 16 (selectively quoting Opp'n at 25).  To the extent Plaintiffs do so argue, the D.C. Circuit rejected a similar interpretation in Archdiocese.  897 F.3d at 324–25.

between the "political" in <u>Mansky</u> and the "political" in the Regulations: in <u>Mansky</u>, the fulcrum of what is acceptable (whether apparel was "political") was not defined while here, the fulcrum (whether a design is "commercial" or "social") is.  Thus, far from being "unmoored," what can come in under the customized postage program is in fact anchored by both the definitions of the inclusions and the list of exclusions.

There is another key difference between the political-speech ban in <u>Mansky</u> and the restrictions before this Court.  In <u>Mansky</u>, although the state law broadly banned all "political" apparel, it was "the unmoored use of the term 'political' . . . *combined with* [the state's] haphazard interpretations" of the term in guidance and briefing that led to the law's demise.  138 S. Ct. at 1888 (emphasis added).  Minnesota's "Election Day Policy"—the state's authoritative guidance on the political-apparel ban—was internally inconsistent and so broad as to invite "erratic application" by election judges attempting to enforce the ban.  <u>Id.</u> at 1888–90.  And in briefing, Minnesota separately argued that the broad term "political" should be interpreted to proscribe "only words and symbols that an objectively reasonable observer would perceive as conveying a message about the electoral choices at issue in [the] polling place"—a standard even Minnesota's counsel struggled to apply during oral argument.  <u>Id.</u> at 1888–89, 1891 (alteration in original).  It was this effort to clarify and qualify the broad term "political" that led to the "confusing line-drawing problems" that undermined the ban.  <u>Id.</u> at 1889.

Plaintiffs argue that here, it is the *absence* of "operational guidance" that will lead to "impossible line-drawing problems" because vendors like Stamps.com will be forced to decide on their own "whether an image is too 'political.'"  Opp'n at 23.  They round off a litany of examples of borderline, potentially political customized postage designs that would otherwise fall into the permitted "commercial" or "social" categories.  For instance, "an image of a

wedding cake as an advertisement for a bakery is certainly a commercial design, but what if the cake displayed rainbow colors with plastic figurines of two brides?"  Id.  But this misses the point.  Under the Regulations, the question is not whether a design is *too* political; it is whether it is political at all, and thus barred, or whether it is instead "expressly allowed" as a commercial or social image.  82 Fed. Reg. at 60,118; see also 39 C.F.R. § 501.21(b)(2) (limiting eligibility for customized-stamp designs to images that are either "commercial" or "social").  As USPS explains, "*all* political content is excluded as a prophylactic matter."  Reply at 19.  There will undoubtedly be some borderline cases, but this simplicity contributes to the program's administrability: the Regulations establish an intentionally broad, categorical exclusion from which USPS, unlike Minnesota in Mansky, does not retreat.

The First Amendment allows the government to exclude entire categories of content from a nonpublic forum.  And there will necessarily be some line drawing whenever the government excludes some category of speech.  The question is whether the government "has articulated a 'sensible basis for distinguishing what may come in from what must stay out,'" Archdiocese, 897 F.3d at 330 (quoting Mansky, 138 S. Ct. at 1888).  The Court concludes that here, USPS has: if the design is remotely political, and not "expressly allowed" by the Regulations as defined, it stays out.

b.  USPS's interests

Moving to Plaintiffs' second argument on reasonableness.  They contend that the Regulations do not reasonably serve either of USPS's two stated interests in adopting them: avoiding harmful misattribution to its brand and avoiding political entanglement.

USPS first says its "exclusion of political speech from the program reasonably serves USPS's legitimate interest in avoiding potential misattribution of the content in Customized

Postage to USPS, especially where misattribution could harm USPS's brand and business equities." MTD at 34. Plaintiffs counter that this "misattribution worry is not even a permissible government interest." Opp'n at 28. According to Plaintiffs, "the First Amendment does not permit censorship of protected speech based on anticipated audience reactions." Id. at 27.

Plaintiffs' argument fails as a matter of law. In Cornelius, the Supreme Court explained that "the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum." 473 U.S. at 810 (citing Perry, 460 U.S. at 52, 52 n.12). Federal courts of appeals have interpreted Cornelius to allow governments to reasonably limit or exclude either speakers or categories of speech "where allowing private expression in a nonpublic forum may imply government endorsement of that expression." Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 148 (2d Cir. 2004) (citing Cornelius, 473 U.S. at 809; United States v. Kokinda, 497 U.S. 720, 726 (1990)); see also Hodge, 799 F.3d at 1165 (concluding that statute restricting expressive assemblages at Supreme Court plaza reasonably served government's interest in avoiding even the "appearance of a Court subject to political pressure" (emphasis in original)). In other words, the government may prophylactically restrict categories of speakers or subjects in a nonpublic forum without running afoul of the First Amendment, including where the potential misattribution risks the government's commercial enterprise. See, e.g., Lehman, 418 U.S. at 303–04 (concluding that restriction barring political advertising on transit system "does not rise to the dignity of a First Amendment violation" based, in part, on the threat that "[r]evenue earned from long-term commercial advertising could be jeopardized" without the restriction).

Plaintiffs argue that even if USPS has a legitimate interest in avoiding potential misattribution, "restricting political (but not commercial) speech does not remotely fit the ends" of that interest. Opp'n at 27. In their view, instead of selectively silencing some speech, USPS

should inform consumers that it permits but does not endorse the speech contained on customized postage.  Id.  The trouble with this argument is that "[t]here is no requirement in a nonpublic forum 'that the restriction be narrowly tailored to advance the government's interests.'"  Hodge, 799 F.3d at 1164–65 (quoting Cornelius, 473 U.S. at 809).  Instead, a restriction need only be "*consistent* with the government's legitimate interest in maintaining the property for its dedicated use."  Archdiocese, 897 F.3d at 330 (emphasis added) (citing Perry, 460 U.S. at 46, 51).  Plaintiffs do not argue that the Regulations are inconsistent with the Postal Service's interest in avoiding misattribution.

USPS next says that its "restriction on political content [also] reasonably serves USPS's 'particularly weighty' governmental interest in avoiding political entanglement, 'given the history of the Postal Service and its problematic historical associations with partisan politics.'"  MTD at 34 (quoting Del Gallo v. Parent, 557 F.3d 58, 73 (1st Cir. 2009)).  Plaintiffs do not contest that USPS has a legitimate interest in avoiding at least *partisan* entanglement but assert that it does not have a similar interest in avoiding entanglement with political issues more generally because the Postal Service's problematic history is associated only with partisan politics and electioneering.  Opp'n at 29.  But this is another tailoring argument and, as explained above, there is no requirement that a rule restricting access to a nonpublic forum be narrowly tailored.  See Hodge, 799 F.3d at 1167 (explaining that Congress was "under no obligation" to limit regulations on assembly in Supreme Court plaza "so as to encompass only those forms of expressive activity . . . that most acutely implicate the government's concerns" and instead "could paint with a broader brush").  Thus, again, USPS is entitled to actively regulate private speech in a nonpublic forum so long as its means are consistent with its purpose.

Finally, restrictions in nonpublic fora are more likely to be considered reasonable where alternative channels of communication remain open.  See Perry, 460 U.S. at 53 ("The reasonableness of limitations on [the defendant's] access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication.").  As USPS points out, Plaintiffs could instead print postcards or envelopes with the proposed design that would not pose the same risks of misattribution and entanglement. MTD at 35.  Plaintiffs do not dispute that they "had alternative means to engage in speech," Opp'n at 30, and counter only that the Regulations are otherwise unreasonable because they are indeterminate and unrelated to USPS's invoked interests.  As explained above, the Court disagrees with Plaintiffs on these grounds.

*       *       *

In all, the Court concludes that the 2018 Regulations satisfy the requirements for restrictions on private speech in nonpublic fora.  Unlike the political-apparel ban in Mansky, the Regulations are not fatally indeterminate; rather, as a categorical ban on political speech, they provide sufficiently clear guidance on what can come in and what must stay out.  The Regulations are also consistent with USPS's legitimate interests in avoiding political entanglement and potential misattribution of postage designs that could harm USPS's business interests.

**IV.    Conclusion**

For the foregoing reasons, the Court will dismiss the claims originally set forth in

Plaintiffs' First Amended Complaint as moot and the supplemental claims set forth in Plaintiffs'

Supplemental Complaint for failure to state a claim.  The Court will also deny as moot Plaintiffs'

Motion for Summary Judgment. An Order accompanies this Memorandum Opinion.


Date: <u>April 26, 2019</u>

_____
CHRISTOPHER R. COOPER
United States District Judge